# FRANKLIN *v.* GWINNETT COUNTY PUBLIC SCHOOLS ET AL.

No. 90–918.   Argued December 11, 1991—Decided February 26, 1992

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 76.

*Joel I. Klein* argued the cause for petitioner. With him on the briefs were *Richard G. Taranto* and *Michael Weinstock.*

*Albert M. Pearson III* argued the cause for respondents. With him on the brief were *Frank C. Bedinger III* and *E. Victoria Sweeny.*

*Stephen L. Nightingale* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts,* and *John P. Schnitker.*\*

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether the implied right of action under Title IX of the Education Amendments of

---

\*Briefs of *amici curiae* urging reversal were filed for the National Women's Law Center et al. by *Marcia D. Greenberger;* and for the Lawyers' Committee for Civil Rights Under Law by *William T. Lake, William H. Brown III, Herbert M. Wachtell, Norman Redlich,* and *Thomas J. Henderson.*

*Peter J. Kadzik* and *Arlene B. Mayerson* filed a brief for the American Council of the Blind et al. as *amici curiae.*

1972, 20 U. S. C. §§ 1681–1688 (Title IX),[1] which this Court recognized in *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), supports a claim for monetary damages.

I

Petitioner Christine Franklin was a student at North Gwinnett High School in Gwinnett County, Georgia, between September 1985 and August 1989. Respondent Gwinnett County School District operates the high school and receives federal funds. According to the complaint filed on December 29, 1988, in the United States District Court for the Northern District of Georgia, Franklin was subjected to continual sexual harassment beginning in the autumn of her tenth grade year (1986) from Andrew Hill, a sports coach and teacher employed by the district. Among other allegations, Franklin avers that Hill engaged her in sexually oriented conversations in which he asked about her sexual experiences with her boyfriend and whether she would consider having sexual intercourse with an older man, Complaint ¶ 10; First Amended Complaint, Exh. A, p. 3;[2] that Hill forcibly kissed her on the mouth in the school parking lot, Complaint ¶ 17; that he telephoned her at her home and asked if she would meet him socially, Complaint ¶ 21; First Amended Complaint, Exh. A, pp. 4–5; and that, on three occasions in her junior year, Hill interrupted a class, requested that the teacher excuse Franklin, and took her to a private office where he subjected her to coercive intercourse, Complaint ¶¶ 25, 27, 32. The complaint further alleges that though

---

[1] This statute provides in pertinent part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a).

[2] This exhibit is the report of the United States Department of Education's Office for Civil Rights based on that office's investigation of this case. Franklin incorporated this exhibit into her amended complaint.

they became aware of and investigated Hill's sexual harassment of Franklin and other female students, teachers and administrators took no action to halt it and discouraged Franklin from pressing charges against Hill. Complaint ¶¶ 23, 24, 35. On April 14, 1988, Hill resigned on the condition that all matters pending against him be dropped. Complaint ¶¶ 36, 37. The school thereupon closed its investigation. Complaint ¶ 37.

In this action,[3] the District Court dismissed the complaint on the ground that Title IX does not authorize an award of damages. The Court of Appeals affirmed. 911 F. 2d 617 (CA11 1990). The court noted that analysis of Title IX and Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.* (Title VI), has developed along similar lines. Citing as binding precedent *Drayden* v. *Needville Independent School Dist.,* 642 F. 2d 129 (CA5 1981), a decision rendered prior to the division of the Fifth Circuit, the court concluded that Title VI did not support a claim for monetary damages. The court then analyzed this Court's decision in *Guardians Assn.* v. *Civil Service Comm'n of New York City,* 463 U. S. 582 (1983), to determine whether it implicitly overruled *Drayden.* The court stated that the absence of a majority opinion left unresolved the question whether a court could award such relief upon a showing of intentional discrimination. As a second basis for its holding that monetary damages were unavailable, the court reasoned that Title IX was enacted under Congress' Spending Clause powers and that

---

[3] Prior to bringing this lawsuit, Franklin filed a complaint with the Office for Civil Rights of the United States Department of Education (OCR) in August 1988. After investigating these charges for several months, OCR concluded that the school district had violated Franklin's rights by subjecting her to physical and verbal sexual harassment and by interfering with her right to complain about conduct proscribed by Title IX. OCR determined, however, that because of the resignations of Hill and respondent William Prescott and the implementation of a school grievance procedure, the district had come into compliance with Title IX. It then terminated its investigation. First Amended Complaint, Exh. A, pp. 7–9.

"[u]nder such statutes, relief may frequently be limited to that which is equitable in nature, with the recipient of federal funds thus retaining the option of terminating such receipt in order to rid itself of an injunction." 911 F. 2d, at 621.[4] The court closed by observing it would "proceed with extreme care" to afford compensatory relief absent express provision by Congress or clear direction from this Court. *Id.*, at 622. Accordingly, it held that an action for monetary damages could not be sustained for an alleged intentional violation of Title IX, and affirmed the District Court's ruling to that effect. *Ibid.*[5]

Because this opinion conflicts with a decision of the Court of Appeals for the Third Circuit, see *Pfeiffer* v. *Marion Center Area School Dist.*, 917 F. 2d 779, 787–789 (1990), we granted certiorari, 501 U. S. 1204 (1991). We reverse.

## II

In *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), the Court held that Title IX is enforceable through an implied right of action. We have no occasion here to reconsider that decision. Rather, in this case we must decide what remedies are available in a suit brought pursuant to this implied right. As we have often stated, the question of what remedies are available under a statute that provides a private right of action is "analytically distinct" from the issue

---

[4] The court also rejected an argument by Franklin that the terms of outright prohibition of Title VII, 42 U. S. C. §§ 2000e to 2000e–17, apply by analogy to Title IX's antidiscrimination provision, and that the remedies available under the two statutes should also be the same. 911 F. 2d, at 622. Because Franklin does not pursue this contention here, we need not address whether it has merit.

[5] Judge Johnson concurred specially, writing that the result was controlled by *Drayden* v. *Needville Independent School Dist.*, 642 F. 2d 129 (CA5 1981), and that there was no need to address whether Titles VI and IX are grounded solely in the Spending Clause and whether Title VII analysis should apply to an action under Titles VI or IX. See 911 F. 2d, at 622–623.

of whether such a right exists in the first place. *Davis* v. *Passman*, 442 U. S. 228, 239 (1979). Thus, although we examine the text and history of a statute to determine whether Congress intended to create a right of action, *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 575–576 (1979), we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. *Davis, supra,* at 246–247. This principle has deep roots in our jurisprudence.

## A

"[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood,* 327 U. S. 678, 684 (1946). The Court explained this longstanding rule as jurisdictional and upheld the exercise of the federal courts' power to award appropriate relief so long as a cause of action existed under the Constitution or laws of the United States. *Ibid.*

The *Bell* Court's reliance on this rule was hardly revolutionary. From the earliest years of the Republic, the Court has recognized the power of the Judiciary to award appropriate remedies to redress injuries actionable in federal court, although it did not always distinguish clearly between a right to bring suit and a remedy available under such a right. In *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803), for example, Chief Justice Marshall observed that our Government "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." This principle originated in the English common law, and Blackstone described it as "a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded." 3 W. Blackstone, Commentaries 23 (1783). See also *Ashby* v. *White,* 1 Salk. 19, 21, 87 Eng.

Rep. 808, 816 (Q. B. 1702) ("If a statute gives a right, the common law will give a remedy to maintain that right . . .").

In *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524 (1838), the Court applied these principles to an Act of Congress that accorded a right of action in mail carriers to sue for adjustment and settlement of certain claims for extra services but which did not specify the precise remedy available to the carriers. After surveying possible remedies, which included an action against the Postmaster General for monetary damages, the Court held that the carriers were entitled to a writ of mandamus compelling payment under the terms of the statute. "It cannot be denied but that congress had the power to command that act to be done," the Court stated; "and the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist. And if the remedy cannot be applied by the circuit court of this district, it exists nowhere." *Id.*, at 624. *Dooley* v. *United States*, 182 U. S. 222, 229 (1901), also restated "the principle that a liability created by statute without a remedy may be enforced by a common-law action."

The Court relied upon this traditional presumption again after passage of the Federal Safety Appliance Act of 1893, ch. 196, 27 Stat. 531. In *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33 (1916), the Court first had to determine whether the Act supported an implied right of action. After answering that question in the affirmative, the Court then upheld a claim for monetary damages: "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law . . . ." *Id.*, at 39. The foundation upon which the *Bell* v. *Hood* Court articulated this traditional presump-

tion, therefore, was well settled. See also *Texas & New Orleans R. Co.* v. *Railway Clerks,* 281 U. S. 548, 569 (1930).

## B

Respondents and the United States as *amicus curiae,* however, maintain that whatever the traditional presumption may have been when the Court decided *Bell* v. *Hood,* it has disappeared in succeeding decades. We do not agree. In *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964), the Court adhered to the general rule that all appropriate relief is available in an action brought to vindicate a federal right when Congress has given no indication of its purpose with respect to remedies. Relying on *Bell* v. *Hood,* the *Borak* Court specifically rejected an argument that a court's remedial power to redress violations of the Securities Exchange Act of 1934 was limited to a declaratory judgment. 377 U. S., at 433–434. The Court concluded that the federal courts "have the power to grant all necessary remedial relief" for violations of the Act. *Id.,* at 435. As Justice Clark's opinion for the Court observed, this holding closely followed the reasoning of a similar case brought under the Securities Act of 1933, in which the Court had stated:

> " 'The power *to enforce* implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case.' " *Id.,* at 433–434 (quoting *Deckert* v. *Independence Shares Corp.,* 311 U. S. 282, 288 (1940)).

That a statute does not authorize the remedy at issue "in so many words is no more significant than the fact that it does not in terms authorize execution to issue on a judgment." *Id.,* at 288. Subsequent cases have been true to this posi-

tion. See, *e. g., Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 239 (1969), stating that the "existence of a statutory right implies the existence of all necessary and appropriate remedies"; *Carey* v. *Piphus*, 435 U. S. 247, 255 (1978), upholding damages remedy under Rev. Stat. § 1979, 42 U. S. C. § 1983, even though the enacting Congress had not specifically provided such relief.

The United States contends that the traditional presumption in favor of all appropriate relief was abandoned by the Court in *Davis* v. *Passman*, 442 U. S. 228 (1979), and that the *Bell* v. *Hood* rule was limited to actions claiming constitutional violations. The United States quotes language in *Davis* to the effect that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Davis*, 442 U. S., at 241. The Government's position, however, mirrors the very misunderstanding over the difference between a cause of action and the relief afforded under it that sparked the confusion we attempted to clarify in *Davis*. Whether Congress may limit the class of persons who have a right of action under Title IX is irrelevant to the issue in this lawsuit. To reiterate, "the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Id.*, at 239. *Davis*, therefore, did nothing to interrupt the long line of cases in which the Court has held that if a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief. See *id.*, at 247, n. 26 (contrasting *Brown* v. *GSA*, 425 U. S. 820 (1976)).[6]

---

[6] Cases cited by respondents and the United States since *Davis* are inapposite, either because they involved holdings that plaintiffs had no right of action, see, *e. g., Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083 (1991); *Karahalios* v. *Federal Employees*, 489 U. S. 527 (1989); *Thompson*

Contrary to arguments by respondents and the United States that *Guardians Assn.* v. *Civil Service Comm'n of New York City,* 463 U. S. 582 (1983), and *Consolidated Rail Corporation* v. *Darrone,* 465 U. S. 624 (1984), eroded this traditional presumption, those cases in fact support it. Though the multiple opinions in *Guardians* suggest the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action. See *Guardians,* 463 U. S., at 595 (WHITE, J., joined by REHNQUIST, J.); *id.,* at 607–611 (Powell, J., concurring in judgment, joined by Burger, C. J.); *id.,* at 612, and n. 1 (O'CONNOR, J., concurring in judgment); *id.,* at 624–628 (Marshall, J., dissenting); *id.,* at 636 (STEVENS, J., dissenting, joined by Brennan and BLACKMUN, JJ.). The correctness of this inference was made clear the following Term when the Court unanimously held that the 1978 amendment to § 504 of the Rehabilitation Act of 1973—which had expressly incorporated the "remedies, procedures, and rights set forth in title VI" (29 U. S. C. § 794a(a)(2))—authorizes an award of backpay. In *Darrone,* the Court observed that a majority in *Guardians* had "agreed that retroactive relief is available to private plaintiffs for all discrimination . . . that is actionable under Title VI." 465 U. S., at 630, n. 9. The general rule, therefore, is that absent clear direction to the contrary by

v. *Thompson,* 484 U. S. 174 (1988); *Texas Industries, Inc.* v. *Radcliff Materials, Inc.,* 451 U. S. 630 (1981); *California* v. *Sierra Club,* 451 U. S. 287 (1981); *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S. 77 (1981); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560 (1979); *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412 (1975); or because the Court rejected a claim for damages under a statute that expressly enumerated the remedies available to plaintiffs, *Massachusetts Mut. Life Ins. Co.* v. *Russell,* 473 U. S. 134 (1985).

Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

## III

We now address whether Congress intended to limit application of this general principle in the enforcement of Title IX. See *Bush* v. *Lucas*, 462 U. S. 367, 378 (1983); *Wyandotte Transportation Co.* v. *United States*, 389 U. S. 191, 200 (1967). Because the cause of action was inferred by the Court in *Cannon*, the usual recourse to statutory text and legislative history in the period prior to that decision necessarily will not enlighten our analysis. Respondents and the United States fundamentally misunderstand the nature of the inquiry, therefore, by needlessly dedicating large portions of their briefs to discussions of how the text and legislative intent behind Title IX are "silent" on the issue of available remedies. Since the Court in *Cannon* concluded that this statute supported no express right of action, it is hardly surprising that Congress also said nothing about the applicable remedies for an implied right of action.

During the period prior to the decision in *Cannon*, the inquiry in any event is *not* " 'basically a matter of statutory construction,'" as the United States asserts. Brief for United States as *Amicus Curiae* 8 (quoting *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 15 (1979)). Rather, in determining Congress' intent to limit application of the traditional presumption in favor of all appropriate relief, we evaluate the state of the law when the Legislature passed Title IX. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 378 (1982). In the years before and after Congress enacted this statute, the Court "follow[ed] a common-law tradition [and] regarded the denial of a remedy as the exception rather than the rule." *Id.*, at 375 (footnote omitted). As we outlined in Part II, this has been the prevailing presumption in our federal

courts since at least the early 19th century. In *Cannon*, the majority upheld an implied right of action in part because in the decade immediately preceding enactment of Title IX in 1972, this Court had found implied rights of action in six cases.[7] In three of those cases, the Court had approved a damages remedy. See, *e. g., J. I. Case Co.*, 377 U. S., at 433; *Wyandotte Transportation Co., supra*, at 207; *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969). Wholly apart from the wisdom of the *Cannon* holding, therefore, the same contextual approach used to justify an implied right of action more than amply demonstrates the lack of any legislative intent to abandon the traditional presumption in favor of all available remedies.

In the years *after* the announcement of *Cannon*, on the other hand, a more traditional method of statutory analysis is possible, because Congress was legislating with full cognizance of that decision. Our reading of the two amendments to Title IX enacted after *Cannon* leads us to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX. In the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U. S. C. § 2000d–7, Congress abrogated the States' Eleventh Amendment immunity under Title IX, Title VI, § 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. This statute cannot be read except as a validation of *Cannon*'s holding. A subsection of the 1986 law provides that in a suit against a State, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a

---

[7] *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964); *Wyandotte Transportation Co.* v. *United States*, 389 U. S. 191 (1967); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968); *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969); and *Superintendent of Ins. of New York* v. *Bankers Life & Casualty Co.*, 404 U. S. 6 (1971).

State." 42 U. S. C. § 2000d–7(a)(2). While it is true that this saving clause says nothing about the nature of those other available remedies, cf. *Milwaukee* v. *Illinois*, 451 U. S. 304, 329, n. 22 (1981), absent any contrary indication in the text or history of the statute, we presume Congress enacted this statute with the prevailing traditional rule in mind.

In addition to the Rehabilitation Act Amendments of 1986, Congress also enacted the Civil Rights Restoration Act of 1987, Pub. L. 100–259, 102 Stat. 28. Without in any way altering the existing rights of action and the corresponding remedies permissible under Title IX, Title VI, § 504 of the Rehabilitation Act, and the Age Discrimination Act, Congress broadened the coverage of these antidiscrimination provisions in this legislation. In seeking to correct what it considered to be an unacceptable decision on our part in *Grove City College* v. *Bell*, 465 U. S. 555 (1984), Congress made no effort to restrict the right of action recognized in *Cannon* and ratified in the 1986 Act or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right. We cannot say, therefore, that Congress has limited the remedies available to a complainant in a suit brought under Title IX.

## IV

Respondents and the United States nevertheless suggest three reasons why we should not apply the traditional presumption in favor of appropriate relief in this case.

## A

First, respondents argue that an award of damages violates separation of powers principles because it unduly expands the federal courts' power into a sphere properly reserved to the Executive and Legislative Branches. Brief for Respondents 22–25. In making this argument, respondents misconceive the difference between a cause of action and a remedy. Unlike the finding of a cause of action, which authorizes a court to hear a case or controversy, the discre-

tion to award appropriate relief involves no such increase in judicial power. See generally Note, Federal Jurisdiction in Suits for Damages Under Statutes Not Affording Such Remedy, 48 Colum. L. Rev. 1090, 1094–1095 (1948). Federal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action. Indeed, properly understood, respondents' position invites us to *abdicate* our historic judicial authority to award appropriate relief in cases brought in our court system. It is well to recall that such authority historically has been thought necessary to provide an important safeguard against abuses of legislative and executive power, see *Kendall* v. *United States ex rel. Stokes,* 12 Pet. 524 (1838), as well as to ensure an independent Judiciary. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in *Bell v. Hood,* 117 U. Pa. L. Rev. 1, 16–17 (1968). Moreover, selective abdication of the sort advocated here would harm separation of powers principles in another way, by giving judges the power to render inutile causes of action authorized by Congress through a decision that *no* remedy is available.

B

Next, consistent with the Court of Appeals' reasoning, respondents and the United States contend that the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power. In *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 28–29 (1981), the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was *unintentional.* Respondents and the United States maintain that this presumption should apply equally to *intentional* violations. We disagree. The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. See *id.,* at 17. This notice problem does

not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB* v. *Vinson,* 477 U. S. 57, 64 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe. Moreover, the notion that Spending Clause statutes do not authorize monetary awards for intentional violations is belied by our unanimous holding in *Darrone.* See 465 U. S., at 628. Respondents and the United States characterize the backpay remedy in *Darrone* as equitable relief, but this description is irrelevant to their underlying objection: that application of the traditional rule in this case will require state entities to pay monetary awards out of their treasuries for intentional violations of federal statutes.[8]

### C

Finally, the United States asserts that the remedies permissible under Title IX should nevertheless be limited to backpay and prospective relief. In addition to diverging from our traditional approach to deciding what remedies are available for violation of a federal right, this position conflicts with sound logic. First, both remedies are equitable in nature, and it is axiomatic that a court should determine

---

[8] Franklin argues that, in any event, Title IX should not be viewed solely as having been enacted under Congress' Spending Clause powers and that it also rests on powers derived from § 5 of the Fourteenth Amendment. See Brief for Petitioner 19, n. 10. Because we conclude that a money damages remedy is available under Title IX for an intentional violation irrespective of the constitutional source of Congress' power to enact the statute, we need not decide which power Congress utilized in enacting Title IX.

the adequacy of a remedy in law before resorting to equitable relief. Under the ordinary convention, the proper inquiry would be whether monetary damages provided an adequate remedy, and if not, whether equitable relief would be appropriate. *Whitehead* v. *Shattuck*, 138 U. S. 146, 150 (1891). See generally C. McCormick, Damages 1 (1935). Moreover, in this case the equitable remedies suggested by respondent and the Federal Government are clearly inadequate. Backpay does nothing for petitioner, because she was a student when the alleged discrimination occurred. Similarly, because Hill—the person she claims subjected her to sexual harassment—no longer teaches at the school and she herself no longer attends a school in the Gwinnett system, prospective relief accords her no remedy at all. The Government's answer that administrative action helps other similarly situated students in effect acknowledges that its approach would leave petitioner remediless.

V

In sum, we conclude that a damages remedy is available for an action brought to enforce Title IX. The judgment of the Court of Appeals, therefore, is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, concurring in the judgment.

The substantive right at issue here is one that Congress did not expressly create, but that this Court found to be "implied." See *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979). Quite obviously, the search for what was Congress' *remedial* intent as to a right whose very existence Congress did not expressly acknowledge is unlikely to succeed, see *ante*, at 71; it is "hardly surprising," as the Court says, *ibid.*, that the usual sources yield no explicit answer.

The Court finds an implicit answer, however, in the legislators' presumptive awareness of our practice of using "any available remedy" to redress violations of legal rights. *Bell* v. *Hood,* 327 U. S. 678, 684 (1946); see *ante,* at 72–73. This strikes me as question begging. We can plausibly assume acquiescence in our *Bell* v. *Hood* presumption when the Legislature says nothing about remedy in expressly creating a private right of action; perhaps even when it says nothing about remedy in creating a private right of action by clear textual implication; but not, I think, when it says nothing about remedy in a statute in which the courts divine a private right of action on the basis of "contextual" evidence such as that in *Cannon,* which charged Congress with knowledge of a court of appeals' creation of a cause of action under a similarly worded statute. See *Cannon, supra,* at 696–698. Whatever one thinks of the validity of the last approach, it surely rests on attributed rather than actual congressional knowledge. It does not demonstrate an explicit legislative decision to create a cause of action, and so could not be expected to be accompanied by a legislative decision to alter the application of *Bell* v. *Hood.* Given the nature of *Cannon* and some of our earlier "implied right of action" cases, what the Court's analytical construct comes down to is this: Unless Congress expressly legislates a more limited remedial policy with respect to rights of action it does not know it is creating, it intends the full gamut of remedies to be applied.

In my view, when rights of action are judicially "implied," categorical limitations upon their remedial scope may be judicially implied as well. Cf. *Cort* v. *Ash,* 422 U. S. 66, 84–85 (1975). Although we have abandoned the expansive rights-creating approach exemplified by *Cannon,* see *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 575–576 (1979); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 18, 23–24 (1979)—and perhaps ought to abandon the notion of implied causes of action entirely, see *Thompson* v. *Thompson,* 484 U. S. 174, 191 (1988) (SCALIA, J., concurring

in judgment)—causes of action that came into existence under the *ancien regime* should be limited by the same logic that gave them birth. To require, with respect to a right that is not consciously and intentionally created, that any limitation of remedies must be express, is to provide, in effect, that the most questionable of private rights will also be the most expansively remediable. As the United States puts it, "[w]hatever the merits of 'implying' rights of action may be, there is no justification for treating [congressional] silence as the equivalent of the broadest imaginable grant of remedial authority." Brief for United States as *Amicus Curiae* 12–13.

I nonetheless agree with the Court's disposition of this case. Because of legislation enacted subsequent to *Cannon*, it is too late in the day to address whether a judicially implied exclusion of damages under Title IX would be appropriate. The Rehabilitation Act Amendments of 1986, 42 U. S. C. § 2000d–7(a)(2), must be read, in my view, not only "as a validation of *Cannon*'s holding," *ante*, at 72, but also as an implicit acknowledgment that damages are available. See 42 U. S. C. § 2000d–7(a)(1) (withdrawing the States' Eleventh Amendment immunity); § 2000d–7(a)(2) (providing that, in suits against States, "remedies (including remedies both at law and in equity) are available for [violations of Title IX] to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State"). I therefore concur in the judgment.