James A. HALIKAS, M.D.

v.

The UNIVERSITY OF MINNESOTA; the Institutional Review Board—Human Subjects Committee, of the University of Minnesota; and its Members Susan A. Barry, M.D., Christopher C. Kuni, M.D., Richard W. Bianco, David R.P. Guay, Pharm.D., Martin L. Gunderson, Ph.d., J.D., Dale E. Hammerschmidt, M.D., and Judith E. Reisman, Ph.d.

No. 4–94–CV–448.

United States District Court,
D. Minnesota,
Fourth Division.

July 8, 1994.

Phillip R. Krass, Timothy Fitzgerald Moynihan, Krass Monroe & Moxness, Bloomington, MN, Melvin Bert Goldberg, William Mitchell College Of Law, St. Paul, MN, for plaintiff.

Mark Rotenberg, University of Minnesota, Gen. Counsel, Clifford Greene, Julie Fleming-Wolfe, John M. Baker, Greene, Espel, Minneapolis, MN, for defendants.

## ORDER

ROSENBAUM, District Judge.

The plaintiff, a medical researcher, claims his rights have been violated and moves for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1367. This matter has been briefed, and oral argument was heard on May 31, 1994. The Court, having been fully advised, denies plaintiff's motion.

### I. *Background*

#### A. *The Parties*

The plaintiff, James A. Halikas, a Minnesota resident, is a medical doctor and a tenured professor in the University of Minnesota Medical School's Department of Psychiatry. Dr. Halikas's work is focused on medical teaching and drug treatment research.

The defendant, University of Minnesota ("the University"), is organized and operates pursuant to the Constitution and statutes of the state of Minnesota. The defendant, Institutional Review Board ("the IRB"), is a medical research review body established to assure compliance with University and federal drug research standards.[1] The remaining defendants are individuals who constitute the University's IRB. The parties do not contest

that the University's and the IRB's actions occurred under color of state law.

### B. *The Precipitating Events*

In the fall of 1992, Dr. Halikas applied to the University's IRB for authority to conduct medical experiments on human subjects. The experiments were designed to test a drug called Gamma Hydroxybutyrate ("GHB") as a possible aid in combatting opium, cocaine, and methadone/heroin addiction. The IRB approved. As part of its review process, the IRB approved Dr. Halikas's proposed informed consent forms. In the summer of 1993, after securing approval from the University and the IRB, the GHB opium addiction study ("GHB Opium Study") began. Most of the investigation's subjects were from Southeast Asia.

On August 4, 1993, a medical faculty member wrote a letter complaining about the GHB Opium Study. The letter was forwarded to the IRB. The letter questioned whether informed consent forms had been signed by the GHB Opium Study patients, whether Dr. Halikas coerced the subjects into GHB experimentation, or whether they were offered standard methadone treatment. Dr. Halikas was sent a copy of the August 4, 1993, letter the next day. Immediately thereafter, he voluntarily terminated the GHB Opium Study. Dr. Halikas formally notified the IRB of this cancellation on August 10, 1993.

On September 10, 1993, the University issued a press release over Dr. Halikas's objection. The press release indicated that the IRB had instituted an investigation concerning the GHB Opium Study. This announcement was made, although the IRB had not yet formally voted to proceed with an investigation. The IRB's formal investigation of the GHB Opium Study began on October 13, 1993. On November 12, 1993, prior to holding hearings, the IRB requested that Dr. Halikas shift his research load to another

---

1. Federal regulations, promulgated by the United States Food and Drug Administration, mandate that any institution doing medical research on human subjects must establish an Institutional Review Board. *See* 21 C.F.R. § 56.101 *et seq.*

All proposed studies in which new or investigational drugs are administered to human subjects must be approved by the IRB. *See* 21 C.F.R. § 56.103.

medical researcher. This action suspended all of Dr. Halikas's human subjects research.[2]

On October 19, 1993, the University notified the United States Food and Drug Administration ("FDA") of the IRB's suspension of Dr. Halikas's research.[3] As a result of this notice, the FDA initiated its own GHB Opium Study investigation on October 21, 1993. Dr. Halikas retained counsel when he received notice of the FDA investigation.

As part of its investigation, the IRB committee heard testimony from two multi-lingual counselors who work with Southeast Asian patients. According to Dr. Halikas, the IRB incorrectly believed that these counselors translated for the GHB Opium Study. Dr. Halikas avers that these counselors worked on another chemical dependency program and were not involved with the GHB Opium Study. Dr. Halikas further asserts that he was not given notice of the time or place of the counselors' testimony. He claims that he repeatedly asked to hear and cross-examine witnesses in the investigation, but was denied this opportunity.

On December 7, 1993, the IRB provided Dr. Halikas with a written list of concerns arising from its inquiry and requested his response. The IRB sent a follow-up letter on December 28, 1993, again requesting Dr. Halikas's written or oral response. The concerns included an apparent failure to document the informed consent of all subjects, and failure to follow FDA regulations. According to the IRB, Dr. Halikas did not apprise the IRB of changes in, or departures from, the GHB Opium Study's protocol respecting drug dosages and scheduling.

Dr. Halikas and his lawyers were invited to meet with the IRB panel on January 31, 1994. He accepted, and testified for at least two hours. He described his research experience and methodology, and replied to the

IRB panel's specific concerns. At this meeting, he again requested an opportunity to cross-examine the complainants and to review the IRB's documents. The IRB panel declined these requests. Dr. Halikas was informed that, prior to his testimony, no written records had been kept of the committee hearings.

The IRB panel issued its conclusions on March 21, 1994. The FDA issued its findings and report in April, 1994. These conclusions were communicated to Dr. Halikas and various agencies and departments within and outside of the University.

The University of Minnesota Board of Regents Policy on Indemnification ("Policy on Indemnification") provides that the University will assume financial responsibility for legal counsel when University researchers are subject to agency investigations. Beginning in October, 1993, and through the present date, Dr. Halikas has requested that the University pay his attorneys' fees and costs arising from the FDA investigation. The University has not paid the legal bills.

### C. *The Present Suit*

Dr. Halikas filed this action on May 18, 1994, asking the Court to enjoin the University from further disseminating the IRB investigation results and for a retraction of information already disseminated. Dr. Halikas also asks the Court to order the University to indemnify him for his attorneys' fees and costs. Dr. Halikas seeks redress, pursuant to 42 U.S.C. § 1983, for violations of due process guaranteed by the Fourteenth Amendment to the United States Constitution. He further asserts violations of 21 C.F.R. § 56.101 *et seq.*,[4] and state contractual breaches. Dr. Halikas seeks injunctive relief, pursuant 28 U.S.C. §§ 2201 and 2202,

---

**2.** At the time of the suspension, Dr. Halikas was listed as a researcher in 21 research projects, only one of which was active. The GHB Opium Study was the only one in which Dr. Halikas was the principal investigator, and therefore, the only study to be suspended.

**3.** A report to the University and the FDA is required, pursuant to 21 C.F.R. § 56.108(b)(3).

**4.** He specifically asserts violations of federal regulations under 21 C.F.R. § 56.108(a), for failure to issue written procedures for hearings; 21 C.F.R. § 56.108(c) and § 56.110, for conducting an expedited review of the GHB Opium Study; 21 C.F.R. § 56.113, for suspending all of his human subjects research and failing to give prompt notice and reason for the suspension; and 21 C.F.R. § 56.115, for failing to make a record of proceedings.

and attorneys' fees and costs, pursuant to 42 U.S.C. § 1988.

## II. *Analysis*

An application for a preliminary injunction is analyzed using the factors set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir.1981). Under *Dataphase*, the Court must evaluate:

1) the threat of irreparable harm to the movant; 2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; 3) the probability that movant will succeed on the merits; and 4) the public interest.

*Dataphase*, 640 F.2d at 114.

The Court, having considered the *Dataphase* factors, declines to grant the relief sought by Dr. Halikas.

### A. *The Threat of Irreparable Harm to Dr. Halikas*

■ Dr. Halikas contends that, absent an injunction, he will suffer irreparable damage to his reputation and career. It is his position that, as a result of the University's and the IRB's actions, he is no longer able to perform human medical research experiments. Dr. Halikas also claims he will suffer irreparable harm if the University does not pay his legal fees and costs asserting that, in the absence of reimbursement, he will be unable to defend himself before the FDA. In this regard, he seeks an order directing the University to follow its Policy on Indemnification.

The Court does not question that a research bar inflicts an injury upon Dr. Halikas. It is also likely that Dr. Halikas will be harmed by debarment from future research. But at the same time, the Court recognizes that Dr. Halikas voluntarily surrendered his GHB Opium Study on August 5, 1993, several months prior to the IRB's suspension. The Court also notes that, during oral argument, the University's counsel indicated that the IRB's suspension is not necessarily irrevocable and may be reversed upon application. The record does not reveal whether or not such an application has been made.

The United States Supreme Court has considered the loss of reputation caused by a denial of the opportunity to perform one's work in *Sampson v. Murray*, 415 U.S. 61, 91–92, 94 S.Ct. 937, 953–54, 39 L.Ed.2d 166 (1974). The Court held that loss of income and harm to reputation "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." In the present case, the Court finds that the claimed harm to Dr. Halikas's reputation is not the kind of irreparable harm which may be remedied by injunctive relief.

Similarly, the claim for payment of attorneys' fees and costs does not invoke the Court's injunctive power. Such a loss is remediable in dollars. A dollar loss invokes the Court's legal powers, as opposed to its equitable powers. *See Franklin v. Gwinnett County Public Schools*, —— U.S. ——, ——, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208 (1992); *Federal Deposit Insurance Corp. v. Faulkner*, 991 F.2d 262, 265 (5th Cir.1993). As a result, the Court finds that the first *Dataphase* factor weighs against the issuance of a preliminary injunction.

### B. *The Balance of the Injury to Dr. Halikas and That Inflicted on the Defendants*

■ The Court takes judicial notice of the University of Minnesota Medical School's worldwide fame in medical research. *See* Rule 201, Federal Rules of Evidence. Such an institution has a great—and protectable—interest in assuring the integrity and humanity of its research investigations. The IRB is the mechanism by which a medical research institution maintains this integrity and humanity.

In this Court's view, an unwarranted intrusion into the IRB's supervisory efforts would inflict grievous harm upon the University and this vital function. Supervision by the IRB protects a vulnerable public. This supervisory power is not without limits. But these limits are delineated in the IRB's own procedures, the law, and federal regulations. On this record, the Court finds that the IRB operated within these procedural limits.

Dr. Halikas worked with a vulnerable population, some of whom did not speak English. The IRB determined that this population may not have been properly advised about the possibility of opting out of the GHB Opium Study. (Krass Aff. Ex. II.) During oral argument, plaintiff's counsel admitted that, in at least one case, Dr. Halikas exceeded the maximum GHB dosage allowed under the GHB Opium Study's research protocol. Even if the Court found that this was the only departure from the research protocol, there is no indication that Dr. Halikas seasonably notified the IRB of this departure. The Court finds that a protocol departure, concerning an experimental drug administered to an unknowing human subject, is not an insignificant event.

Federal regulations require that an IRB report any suspension or termination of IRB research approval. This report includes the reasons given to the investigator (researcher), the institutional officials, and the FDA. 21 C.F.R. § 56.113. Granting Dr. Halikas's motion would require the IRB to violate this regulation and would undermine its protections.

The Court determines that an injunction would impair the IRB's ability to protect the public. The balance of injury weighs strongly against issuance of the injunction.

## C. *Probability of Success on the Merits*

In considering injunctive relief, and while not overriding the other *Dataphase* factors, the likelihood of success on the merits is preeminent. *S & M Constructors, Inc. v. Foley Company*, 959 F.2d 97, 98 (8th Cir.) *cert. denied*, —— U.S. ——, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992). On the basis of the record before the Court, it appears that Dr. Halikas has only a slight chance of prevailing on the merits. The IRB is created by federal regulations. As such, the Court finds that the Code of Federal Regulations [5] and the University of Minnesota General Assurance Agreement [6] define the due process standards applicable to human subjects research. While Dr. Halikas points to the University's tenure code [7] and its hospital by-laws [8], these are not part of the federal regulatory scheme, and the IRB is not bound by these procedures.

Under 21 C.F.R. § 56.108(a), the IRB must employ written procedures "for conducting its initial and continuing review of research and for reporting its findings and actions to the investigator and the institution." These written procedures are contained in the broadly worded University of Minnesota General Assurance Agreement.[9]

5. 21 C.F.R. § 56.101 *et seq.*

6. University of Minnesota General Assurance Agreement # M1337.

7. University of Minnesota Board of Regents Policy: Faculty and Staff.

8. University of Minnesota Hospital and Clinic Bylaws of the Medical and Dental Staff.

9. The University of Minnesota General Assurance Agreement # M1337, Sections IV(c)(5) and (6) provide:

(5) Any of the reports or complaints ... shall be handled by the Committees in the following manner:

(a) All complaints related to the conduct of research with human subjects shall be directed (in writing) to the Administrator to the Committees who shall review the complaint with the Chairman of the relevant Committee and bring it to the attention of the first subsequent meeting, at which time the Committee will consider each complaint and if they decide, by majority vote, that the complaint merits investigation, then the complaint shall receive a full investigation. An investigator shall then be informed that a complaint has been filed and is under investigation by the Committee.

(b) For each investigation, an *ad hoc* subcommittee ... will have access to the resources necessary to conduct a complete investigation ... and should be able to draw upon the competence of non-Committee members in conducting its investigation.

(c) Upon completion of the investigation, the *ad hoc* investigating subcommittee shall report its findings to the two health and biological sciences Committees or the social and behavioral sciences Committee, as applicable.

(6) It shall be the obligation of the Committees on the Use of Human Subjects in Research to provide such advice, guidance, and supervision as seems necessary to continue the full protection of the rights and welfare of the human subjects in investigations which is the objective of the prior review and the above procedures. If, at any time, there is question as to the full protection afforded to human subjects, Committees have the power to suspend or withdraw approval from any investigation involving human subjects and, following such suspension or withdrawal, no investigator shall

The Court finds that the IRB is in sufficient compliance with the procedures in the University of Minnesota General Assurance Agreement and the applicable federal regulations to satisfy the required procedural due process. Dr. Halikas received multiple written notices of the charges against him, as well as a copy of the memo that triggered the investigation. Dr. Halikas was notified that he could have counsel present during the IRB proceeding, and he was so accompanied. He testified before the IRB for more than two hours. He was invited to provide written documentation to the IRB and to identify persons who would support his position. While Dr. Halikas complains that he was denied the opportunity to hear and cross-examine witnesses and to review the IRB's documents, these procedures are not required under the applicable rules.

An IRB proceeding is, simply, not a federal criminal prosecution. Such a proceeding is governed by contracts and federal regulations which do not require, or provide, the full panoply of criminal procedural rights. *See, Meleen v. Hazelden Foundation,* 740 F.Supp. 687 (D.Minn.1990) *aff'd,* 928 F.2d 795 (8th Cir.1991). Dr. Halikas voluntarily entered into an employment contract and conducted his research under the aegis of the University and its research-regulatory regime. He received the process which is his due.

The probability of success on the merits factor militates against the issuance of a preliminary injunction.

### D. *Public Interest*

 The public has a great interest in maintaining the integrity of institutional research on human subjects. This is particularly true for a vulnerable, non-English speaking, largely immigrant, population. IRB supervision of biomedical studies protects the patients involved in those studies. The Court finds that barring the IRB from transmitting the results of its investigation would endanger the public and hinder this essential function. Under these circum-

stances, the Court finds that the public interest strongly favors a denial of the injunction. Therefore, after consideration of all the *Dataphase* factors, the Court declines to grant a preliminary injunction in this case.

Finally, if Dr. Halikas has a claim against the University for damages resulting from contractual or procedural violations, that claim is not properly placed in this Court. A federal court cannot award past damages against the University, because it is a state institution. *Schuler v. University of Minnesota,* 788 F.2d 510, 516 (8th Cir.1986), *cert. denied* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). Such a claim is barred by the Eleventh Amendment to the United States Constitution. Dr. Halikas's case is analogous to *Sherman v. Curators of the University of Missouri,* 16 F.3d 860 (8th Cir.1994), where the Court held that the Eleventh Amendment barred a plaintiff from suing a state university for damages in federal court.

### III. *Conclusion*

For the reasons set forth above, and based upon all of the files, records, and proceedings herein, IT IS ORDERED that:

1. Plaintiff's motion for a preliminary injunction is denied.

2. Plaintiff's claim for damages is dismissed without prejudice.

---

continue to engage in procedures involving human subjects without further approval. Such action shall be reported promptly to the

investigator, appropriate institutional officials, and the Secretary [of the Department of Health and Human Services].