**Jo D. MOLINARY, Trustee of the Susan Pruitt Cloud Land Trust, Plaintiff,**

v.

**POWELL MOUNTAIN COAL COMPANY, INC., d/b/a Wax Coal, Defendant.**

**No. 91–0007–B.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

May 24, 1995.

Walton Davis Morris, Jr., Charlottesville, VA, Daniel Robert Bieger, Copeland, Molinary & Bieger, P.C., Abingdon, VA, for Jo D. Molinary.

Timothy Ward Gresham, Penn, Stuart, Eskridge & Jones, Abingdon, VA, Stephen M. Hodges, Penn, Stuart, Eskridge & Jones,

Abingdon, VA, for Wax Coal Co., Powell Mountain Coal Inc.

## MEMORANDUM OPINION

WILSON, District Judge.

This is a class action citizen suit for damages pursuant to § 520(f), 30 U.S.C. § 1270(f), of the Surface Mining Control and Reclamation Act (SMCRA), by class representative Jo. D. Molinary (Molinary) against Powell Mountain Coal Company, Inc., d/b/a Wax Coal (Wax Coal).[1] The class—known as the "Pruitt heirs"—owns more than a 99 percent undivided interest in the surface-rights to a fifty acre tract of land located in Lee, County, Virginia that Wax Coal auger mined without lawful authority. The Virginia Division of Mined Land Reclamation (DMLR) issued Wax Coal a permit to auger mine the property but later revoked that permit and ordered the property reclaimed when it determined that Wax Coal's "right of entry" documents failed to list all record surface owners. This court submitted a single factual question to the jury for its resolution—whether Molinary had proven by a preponderance of the evidence that Wax Coal was wilful, reckless, or grossly negligent in failing in its permit application to list all the surface owners and in failing to supply documentation that it had the legal authority to extract coal from the Pruitt heirs tract by the auger mining method. The jury found, in effect, that Wax Coal misled DMLR. The court memorializes various rulings and awards damages in accordance with the jury's findings.

## I.

In February of 1990, Wax Coal applied to DMLR for a permit to conduct surface coal mining operations in an area that included part of the tract in question, known as the Pruitt heirs tract. The tract is mountainous and has little commercial value apart from timber and mineral rights. Years before the advent of the SMCRA, the area augured had been surfaced mined by parties unrelated to Wax Coal. The area had not been reclaimed, except by nature, leaving a bench and highwall. Members of the class use the property primarily for recreational purposes—hunting, hiking, camping and the like. Wax Coal owns the mineral rights by virtue of an 1887 severance deed. Wax coal also has an approximate .14% undivided interest in the surface estate. Class members owned the rest. In its application, Wax Coal listed "Pruitt Heirs" as the surface owners of the tract but failed to list the individual owners. Wax Coal also informed DMLR that it had obtained a legal opinion that no lease was required from the surface estate's other owners. Operating on that information, DMLR issued a permit to Wax Coal. Wax Coal then mined, despite strong on site objections by numerous class members, 4423.51 tons of clean coal by the auger mining method from the tract and sold it for $190,122.46. It also hauled 12,321.70 tons of coal from other tracts across the Pruitt heirs' tract.

In November 1990, DMLR determined that Wax Coal had acquired its permit in violation of the state permit requirements—specifically, that Wax Coal's right-of-entry documents failed to list all record owners. As a result, DMLR revoked Wax Coal's permit, issued a cessation order against Wax Coal, and ordered Wax Coal to reclaim the tract.[2] On January 16, 1991, Molinary filed the present suit under the SMCRA's citizen suit provisions, § 1270(f), for alleged damages from Wax Coal's mining operation before the permit was revoked.

## II.

■ Wax Coal contends that "paper violations"—violations in the permitting process as distinguished from violations of environmental performance standards—are not actionable under 30 U.S.C. § 1270(f). The court finds that contention only partially correct. Section 1270(f) makes actionable all

---

1. Molinary also asserts a wheelage and haulage claim under the court's supplementary jurisdiction. 28 U.S.C. § 1367. The court finds that Molinary has not proven her damages for her wheelage and haulage claim.

2. Because the appeal of the revocation was pending in the Virginia court system, the court held this case in abeyance at the request of the parties. Later, this court concluded that it should proceed.

violations of rules, regulations, orders or permits issued under the SMCRA that result in injury.[3] It makes no distinction between violations in the permitting process that result in injury from permit violations or violations of environmental performance standards that result in injury. The key is injury. If there is no attendant injury to property, there is no right of action under § 1270(f). Thus, trivial, immaterial omissions by permit applicants are not actionable. Conversely, significant, material violations—those that result in real harm are actionable. The wrongful mining of land through manipulation of or deception in the permitting process is no "mere" paper violation; it is, thus, a violation actionable under § 1270(f).

Nevertheless, the court views § 1270(f) as a potential source of conflicting adjudications between the courts on the one hand, and the state and federal regulatory authorities responsible for administering the SMCRA on the other. Congress did not intend for the courts to usurp the regulatory authority and discretion of the Secretary and the states under the guise of the citizen suit provisions of § 1270(f). This case, however, does not expand the parameters of congressionally authorized citizen suits by entangling the court in the administrative prerogatives of the Secretary or DMLR. Wax Coal surfaced mined without lawful authority; DMLR revoked Wax Coal's permit and ordered it to reclaim the land; and a jury found that Wax Coal

acted wilfully or recklessly or without regard for the consequences of its actions.[4]

## III.

■ The SMCRA requires permit applicants seeking to surface mine coal on property where the mineral estate has been severed from the surface estate to submit the written consent of the surface owner or a conveyance that expressly grants or reserves the right to surface mine. 30 U.S.C. § 1260(b)(6)(A) & (B). Virginia's regulatory program implementing the provisions of SMCRA requires an applicant to list the name and address of *each* legal or equitable owner of the surface estate and to describe the legal rights permitting the applicant to enter and surface mine. Va Regs. §§ 480–03–19.778.13(e) and 480–03–19.778.15(b). Wax Coal maintains that its failure to supply complete "right of entry" information is immaterial because its co-ownership of the surface rights and its deed to the coal gave it the right to mine coal by the auger method without the consent of all surface owners. The court disagrees.

■ In Virginia, a tenant in common cannot change or alter the common property to the detriment of his cotenants without his cotenants' consent. The court finds *Chosar Corporation v. Owens,* 235 Va. 660, 370 S.E.2d 305 (1988), instructive. In *Chosar,* a group of cotenants owning a fractional interest in a 61–acre tract sought to enjoin Chosar Corporation—an 85 percent owner—from

**3.** More particularly, § 1270(f) makes actionable all violations of rules, regulations, orders or permits issued pursuant to Chapter 25 of Title 30 that result in injury. The regulations of a state regulatory authority implementing an approved state program are issued pursuant to Chapter 25 of Title 30. *Molinary v. Powell Mountain Coal Co., Inc.,* 779 F.Supp. 839 (W.D.Va.1991); *see* 30 U.S.C. § 1291(25) & (26); *but see Haydo v. Amerikohl Min., Inc.,* 830 F.2d 494 (3rd Cir.1987).

**4.** The jury was specifically asked:
Has the plaintiff proven by a preponderance of the evidence that defendant acted wilfully, recklessly, or that defendant was grossly negligent in failing in its permit application to list all the Pruitt heirs and in failing to supply documentation that it had the legal authority to extract coal from the Pruitt heirs tract by the auger method?
The jury was instructed as follows as to the meanings of the terms "wilfulness," "recklessness," and "gross negligence":

One acts willfully when he acts with the specific intent to do something the law forbids. A willful act may be described as one done intentionally, knowingly, and purposely, without justifiable excuse.
One acts recklessly when he consciously disregards a substantial and unjustifiable risk that harm will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.
One is grossly negligent when he intentionally fails to perform a manifest duty in reckless disregard of the consequences as affecting the property of another.

mining the tract and from hauling coal across the land. The court held that "the extraction of coal from the ... tract is a material and continuing destruction of the very substance of the mineral estate. [*Chosar*] had no right to remove coal from the common property without the consent of [the remaining surface owners]." 370 S.E.2d at 307–08. Accordingly, in the present case, Wax Coal, a negligible .14% owner of the surface estate, had no right by virtue of its cotenancy to auger mine the Pruitt heirs tract without the consent of the remaining surface owners.

■ Wax Coal also contends that the language of the 1887 deed gave it the right to mine coal by the auger method. The court, once again, disagrees. In *Phipps v. Leftwich,* 216 Va. 706, 222 S.E.2d 536 (1976), the Virginia Supreme Court held that a coal severance deed executed before the advent of surface mining technology in the area where the land is located conveys only the right to remove coal by underground methods. According to the Virginia Supreme Court:

> There is uncontradicted evidence that strip mining was unknown in Dickenson County in 1902 and that *the only method of mining then recognized in the area* was underground mining, such as shaft, deep, or drift mining. Thus, underground mining was the only kind of coal mining within the contemplation of the parties to the 1902 deed, and therefore, the broad language of the deed is applicable only to underground mining.

*Phipps v. Leftwich,* 222 S.E.2d at 540 (emphasis added). In *Phipps,* the severance deed for the Dickenson County, Virginia tract was executed in 1902—almost fifteen years after the deed was executed that creat-

ed the coal estate at issue in this case in nearby Lee county, Virginia. It follows that the only rights that the severance grantor conveyed were (1) the coal in place and (2) the right to remove it by underground mining methods. The severance grantor retained the right to use the surface without interference from the mineral owner, other than those surface effects associated with underground mining methods that did not remove subjacent support for the surface. *See Stonegap Colliery Co. v. Hamilton,* 119 Va. 271, 89 S.E. 305, 310 (1916).[5] For the reasons stated, Wax Coal's violations of the permitting process were material.

## IV.

The parties have submitted the issue of damages to the court. At an earlier stage of the case, Wax Coal moved in limine for the court to articulate the method for determining the measure of damages. The court found that motion premature. Nevertheless, the court noted:

> Assuming that Molinary's allegations are true, and Molinary proves that Wax Coal acted willfully, the appropriate measure of damages might include any actual damage as well as any benefit Wax Coal derived from the unlawful use of the land. However, at this juncture, any determination as to how to measure that benefit would be premature. Moreover, on a fully developed factual record a more appropriate remedy might appear.

*Molinary v. Powell Mountain Coal Company, Inc.,* 832 F.Supp. 169, 172 (W.D.Va.1993). Having the benefit of the jury's determination that Wax Coal's omissions resulted from

---

5. Wax Coal argues that auger mining is a less intrusive form of surface mining than strip mining and that *Phipps* had no occasion to determine whether the owner of the mineral rights could properly auger mine although it could not strip mine. The court believes Wax Coal wrongly focuses on the extent of surface injury as *Phipps'* rationale. *Phipps* had more to do with the intentions of the parties than with the extent of surface injury. Surface mining was virtually unheard of or at least not employed in Southwest Virginia at the time the deed in *Phipps* was executed. Mining was below ground, leaving intact the surface estate. Surface mining was not within the contemplation of the parties and,

therefore, was not authorized under those earlier deeds.

Wax Coal also denies that it extracted coal by "surface mining methods" because an earlier mining operation initially exposed the seam of coal, and thus, Wax Coal simply removed another coal company's abandoned materials. The court finds this argument meritless. Essentially, Wax Coal is arguing that a surface owner that consents to some surface mining is powerless to prevent non-consensual surface mining. Moreover, video-taped evidence received at trial graphically shows substantial additional injury to the surface estate.

wilfulness, recklessness or gross negligence, and the benefit of a more fully developed factual record, the court imposes judgment.[6]

Ordinarily, injury to the surface estate constitutes one of the largest items of recoverable damages in an action under § 1270(f). But an award for injury to the surface estate also presents, given the authority of DMLR or the Secretary to order reclamation, a potential double recovery problem, as well as a conflicting adjudications problem. And those problems loomed in this case because class members sought, through administrative channels, to compel more extensive reclamation.[7] Against that backdrop, Molinary, on the eve of trial, agreed to withdraw class claims for damage to the surface estate that probably would be mooted by reclamation and to pursue reclamation through the administrative process.[8] The withdrawal of that item of damage leaves loss of use, which has been stipulated to be nominally valued at $500.00, and the benefit Wax Coal derived from mining the tract as the remaining sources of a damage award. The recoverability of that latter item of damage has generated the most controversy, and the court now turns to that issue.

 Wax Coal essentially ran roughshod over the rights of the surface owners—from the beginning of the permitting process to the beginning of on site operations when angry surface owners confronted Wax Coal as it bulldozed its way through the property.[9] Under the circumstances, in the court's view, the most closely analogous precedent to guide the measure of recovery is found in cases involving "bad faith" trespassers:

> Bad faith trespassers who sever minerals or timber from the soil are usually subjected to "harsh" measure of damages—the value of the severed article itself, not merely the value of the right to mine or harvest it. This value is figured at some point after the article is severed, perhaps even after it is in some manufactured state, and the bad faith trespasser is given little or no credit for costs of mining or transporting or milling the article.

1 DOBBS, LAW OF REMEDIES § 5.3(3) at 744 (2d ed. 1993). Virginia, like many jurisdictions, permits that higher measure of damages in "bad faith" trespass cases, the value of wrongfully mined coal as measured by its sale price. *See Payne v. Consolidation Coal Company*, 607 F.Supp. 378, 381–82 (W.D.Va. 1985); *see generally Mullins v. Clinchfield Coal Corp.*, 227 F.2d 881 (1955); *Bostic v. Whited*, 198 Va. 237, 93 S.E.2d 334 (1956).[10]

6. Wax Coal objected to the inclusion of gross negligence in the special interrogatory to the jury. The court included gross negligence in the special interrogatory, however, because Virginia cases and cases from other jurisdictions find it to be an appropriate predicate to a higher measure of damages. *See Bostic v. Whited*, 198 Va. 237, 93 S.E.2d 334 (1956). Moreover, the court stringently defined gross negligence. *See infra* text accompanying note 4.

7. The federal Office of Surface Mining Reclamation and Enforcement ("OSM") refused to cite Wax Coal for any reclamation violation. Molinary appealed that decision to the United States Department of the Interior Office of Hearings and Appeals, and the reclamation issue is currently before that office.

8. Wax Coal, under 28 U.S.C. § 1927, seeks to recover from opposing counsel personally its costs, expenses, and attorney's fees attributable to its preparation for reclamation related issues. The court reserves that collateral issue for resolution when the court resolves Molinary's claim for attorney's fees and expenses.

9. Although Wax Coal's permit application listed the Pruitt heirs as having an interest in the surface estate, its correspondence with DMLR seemed designed to convey a different message, as evidenced by correspondence from Wax Coal's president to the Commissioner of DMLR:

> As a representative of *the owner of the surface* upon which this permit is located, I request that, upon the completion of the mining, the surface be returned to unmanaged forest.
> I also request that any roads that are constructed upon this property be left intact upon the completion of mining for forest fire control and management of this and adjacent property.

(Pl.Ex. 1.) (emphasis added). When questioned about its legal authority to surface mine, Wax Coal obtained a legal opinion that it could mine the property based upon its representation that no excavation would occur. Wax Coal then represented to DMLR that it had sought and obtained a legal opinion that consent to mine was unnecessary.

10. Wax Coal correctly argues that it owned the coal and that it was not a trespasser because of its negligible .14% ownership of the surface estate. The court still finds "bad faith" trespasser cases analogous because Wax Coal lacked consent or lawful authority to surface mine.

In the present case, the sales price of the unlawfully mined coal was $190,122.46. That amount greatly exceeds the fair market value of the Pruitt heirs tract. But like other environmental statutes, the SMCRA was designed to protect more than simply transitory, economic interests. *See generally Ohio v. United States Dep't of the Interior,* 880 F.2d 432 (D.C.Cir.1989). Moreover, § 1270(f) would do little to discourage the kind of intentional conduct that occurred in the present case if damages were limited to the value of the surface estate or to the theoretical value of consent rights, consent that was not obtained.[11] Accordingly, the court will measure damages as it would in the case of a "bad Faith" trespasser and award Molinary $190,122.46.[12]

## V.

For the reasons stated above, the court will award Molinary $190,122.46 under her claim pursuant to § 1270(f), plus reasonable attorney's fees and costs.[13]

---

11. Wax Coal argues that it would be arbitrary to award damages based upon a "benefits received" analysis because it owned the coal. The court disagrees with Wax Coal's argument.

First, a pure "value-of-the-right-exercised" analysis would hardly discourage future misconduct. Under such an analysis, it would matter little, economically speaking, to the owner of the coal who has no right to surface mine whether he obtains consent or simply mines the coal without authority and pays for the value of the right exercised only after a court orders him to pay. If a "benefits received" analysis appears punitive, it is, nonetheless, appropriate, as a provision that authorizes the imposition of damages, in the absence of a contrary intent, carries with it the authority to award punitive damages. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) ("[O]ur inquiry is not whether Congress expressly allowed punitive damage awards. Punitive damages have long been a part of traditional state tort law."); *see Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 1035–36, 117 L.Ed.2d 208 (1992) ("The

general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."). Second, determining the value of the consent rights of property owners that have not or would not consent would be a tenuous exercise, at best. Again, however, such an award would do little to discourage intentional or grossly negligent conduct.

12. After the jury's verdict, the court directed both parties to submit briefs and exhibits concerning the proper measure of damages. Wax Coal argued that if the value of the surface mining rights, measured at $3,317.63, was an inappropriate remedy, then the net benefit to Wax Coal should be used. Wax Coal failed to provide the court with the net amount, however, and concluded that "the court has no basis to determine that amount at this time."

13. Wax Coal's motion pursuant to 28 U.S.C. § 1927 will be considered in connection with Molinary's motion for attorney's fees and costs pursuant to 30 U.S.C. § 1270. *See* note 8.