**E.D., a minor child by and through her next friend Hazel DUKES; and Hazel Dukes, Plaintiffs,**

v.

**ENTERPRISE CITY BOARD OF EDUCATION, Defendant.**

**No. CIV.A. 03–1–195–S.**

United States District Court, M.D. Alabama, Southern Division.

July 28, 2003.

Bobbie S. Crook, Bobbie S. Crook P.C., Dothan, AL, Dusty L. Harrell, Dusty L. Harrell, PC, Dothan, AL, for E.D., a minor child by and through her next friend, Hazel Dukes, Hazel Dukes, plaintiffs.

M. Chad Tindol, Marsh Cotter & Tindol LLP, Enterprise, AL, for Enterprise City Board of Education, defendant.

### MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Judgment on the Administrative Record/Motion for Summary Judgment filed by the Defendant, the Enterprise City Board of Education ("Board") and on a Motion for Judgment on the Administrative Record, filed by the Plaintiffs.

The Plaintiffs, E.D. through her next friend Hazel Dukes and Hazel Dukes ("Dukes") (collectively "the Plaintiffs"), filed a Complaint in this court against the Board, appealing from the adverse decision of an administrative hearing officer. The Plaintiffs bring claims for violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415 (Count I) and for violation of IDEA through 42 U.S.C. § 1983 (Count II).

The IDEA, formerly known as the Education for All Handicapped Act ("EHA"), 20 U.S.C. § 1400 et seq., provides federal money to state and local education agencies in order to assist them in educating disabled children, on the condition that the states and local agencies implement the substantive and procedural requirements of the Act. The Plaintiffs contend that the Board has violated E.D.'s procedural and substantive rights under IDEA.

### II. STANDARD OF REVIEW

When a district court reviews findings and decisions made during IDEA administrative hearings, the court receives the administrative record, but has the discretion to hear additional evidence, and renders a decision based on a preponderance of the evidence. *See Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir.2000). The IDEA specifically provides that the court may take additional evidence and may fashion relief that the court deems appropriate. 20 U.S.C. § 1415(c)(2); *Weiss by Weiss v. School Bd. of Hillsborough County*, 141 F.3d 990, 992 (11th Cir.1998). In this case, neither side asked to present additional evidence.

"[T]he extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court." *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir.1988). "[F]indings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *M.M. v. School Dist. of Greenville Co.*, 303 F.3d 523 (4th Cir.2002). The court may accept or reject the findings of the hearing officer, but must be careful not to substitute its judgment for that of the state educational authorities, and accords

the administrative decision due weight. *Maricus W. v. Lanett City Bd. of Educ.*, 141 F.Supp.2d 1064 (M.D.Ala.2001). The court reviews legal conclusions by the hearing officer under a de novo standard. *Id.* at 1065–66.

### III. *FACTS*

The submissions of the parties establish the following facts:

E.D. was identified as being speech and language delayed in kindergarten and as being developmentally delayed and speech and language disabled in first grade. In the fourth grade, she was determined not to be speech and language delayed or developmentally delayed, but was identified as learning disabled. E.D. is presently classified as being learning disabled in reading, written expression, and math. She has received services through the special education department of the Board.

E.D. experienced a traumatic event with her special education teacher and was withdrawn from school at the beginning of her fifth grade year by her parent, Dukes. Dukes is E.D.'s adoptive mother and natural grandmother. Dukes filed a request for due process on November 19, 2001, stating that the Board had denied E.D. a free appropriate public education ("FAPE").

Beverly Frazier ("Frazier") is a tutor provided by the Board who began teaching E.D. in January of 2002. Frazier testified at the Administrative Hearing that E.D. has benefitted from her tutoring. Tr. at 141.[1]

A mediation was conducted on the due process request which resulted in a settlement. The Settlement Agreement was incorporated into an order by the hearing officer and the matter was dismissed on February 19, 2002.

The Settlement Agreement provided that the Board would provide a speech/language evaluation of E.D. by Jana Robinette and a parental consultation about that evaluation, and services arising from the evaluation as appropriate. It also provided that the Board would contact Dr. Robert Nolan ("Dr.Nolan") to clarify his earlier recommendations regarding E.D. and would provide a draft individual education program ("IEP") to Dr. Nolan with sufficient time prior to the IEP meeting for him to comment.

The agreement further provided for diagnostic testing and that Mary Cannon ("Cannon"), the Special Education Director, would orient E.D.'s service providers to her needs and status, and that Dukes could attend such orientation. Other provisions included that Dr. Bob Phares would serve as the contact for obtaining E.D.'s educational records; that extended day services would be provided once E.D. was reintroduced to school; that counseling services as prescribed by Carol Dean ("Dean"), a licensed professional counselor who began treating E.D. in January 2002, would be paid for by the Board; that tutoring would continue; that Beverly Hunter ("Hunter") of the State Department of Education would be consulted about the development of a new IEP; that an assessment in the form of the Woodcock–Johnson Individual Test of Achievement would be given in the first semester of every school year and the Wechsler Individual Achievement Test ("WIAT") would be given in the final semester; and that the portion of the cost of the evaluation by Dr. Nolan which was not covered

---

1. References to the transcript of the administrative hearing are denoted by "Tr." and the page and/or page and line number.

by the Dukes's insurance would be paid by the Board.

The IEP for E.D. under which the Board was operating at the time of the Settlement Agreement was developed in May of 2001. This IEP was set to expire on May 23, 2002. The IEP was amended by Cannon in January 2002 to state that E.D. was being provided services at home.

A planning meeting was held with the tutor and Dukes on April 12, 2002. Additional meetings set for April 19 and 26 were cancelled by the Plaintiffs.

A meeting was held on May 3, 2002 to discuss E.D.'s IEP. On May 6, 2002, Dukes sent a second request for due process, alleging that the Board was in violation of the Settlement Agreement. Another meeting to discuss the IEP was held on June 4, 2002, but Dukes did not attend this meeting.

In June of 2002, E.D. was first treated by Dr. Nelson Handal ("Dr. Handal"). Dr. Handal specializes in child/adolescent psychiatry. He diagnosed E.D. with an overanxious disorder and with social phobia. He prescribed medication for E.D.

On June 24, 2002, a due process hearing convened and testimony was received for one day. Due to a medical emergency, the hearing had to be reconvened at a later time.

On July 12, 2002 a final IEP was developed. The IEP provided that there would be a "Circle of Friends" activity, a coach, and continued counseling in an attempt to transition E.D. back to school. The IEP also referred to the use of audio-visual aids. Dukes did not attend the July 12 IEP meeting.

The due process hearing reconvened on October 14, 2002. The Hearing Officer took testimony from nine witnesses and considered approximately sixty exhibits, many of which contained multiple pages. On December 23, 2002, the hearing officer entered a 152 page decision which made extensive fact findings and analyzed those facts under the applicable law. The Hearing Officer noted concerns with the Plaintiffs' limited cooperation with the schools. The Hearing Officer ultimately determined that the schools were not in violation of IDEA, and rendered a decision in favor of the Board.

## IV. DISCUSSION

As stated earlier, the Plaintiffs have brought claims for violation of IDEA and for violation of IDEA through 42 U.S.C. § 1983. As the substance of the claims is the same, the court will address the merits of these claims together. Only the issue of the availability of damages under the two statutes requires a separate discussion.

The IDEA requires that "children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet the handicapped child's unique needs, ... [and to ensure] that the rights of handicapped children and their parents or guardians are protected." 20 U.S.C. § 1400(c).

To carry out these objectives, the IDEA provides procedural safeguards to permit parental involvement in all matters concerning the child's educational program and allows parents to obtain administrative and judicial review of decisions they deem unsatisfactory or inappropriate. *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

One issue raised by the Board is whether the conduct of the Board prior to February 2002 is at issue in this case. The Hearing Officer concluded that anything occurring before the settlement of the first request for due process is subject to res judicata. It appears to the court that the Plaintiffs are not directly challenging such conduct as a separate claim. Therefore,

the court will only address the issue of conduct prior to the Settlement Agreement where it is relied upon in support of claims asserted by the Plaintiffs based on conduct occurring after the Settlement Agreement.

### A. *Claims*

The claims being brought by the Plaintiffs in this court can be divided roughly into three categories: violations of the settlement agreement, procedural and substantive violations of IDEA which allegedly resulted in denial of a FAPE, and denial of a FAPE by the July 12 IEP. The court will address each of these broad categories in turn.

### 1. Breach of Settlement Agreement

#### a. Applicable Standard

■ The Board states that the Hearing Officer informed the parties by telephone that the standards applicable to contempt proceedings were applicable to challenges to the Settlement Agreement in the proceedings before him. The Plaintiffs dispute this representation. In the requested additional briefing on this issue, the Plaintiffs strenuously objected to the application a contempt standard in this case.

The court has not been cited to any authority for the proposition that a contempt standard applies where a hearing officer dismisses a request for a due process hearing and issues an order adopting a settlement agreement, nor that the standard applies to this court's review of the hearing officer's decision. The only authority cited by the Board in its initial submission is 17 Am.Jur.2d *Contempt* § 40

(2002). In 20 Am.Jur.2d *Courts* § 1 (1995), however, contempt is described as being an inherent power of a court which is not possessed by an administrative agency. In addition, the Ninth Circuit has determined that only courts of law are empowered to punish contempt committed before an administrative tribunal. *A–Z Intern. v. Phillips*, 179 F.3d 1187, 1192 (9th Cir.1999). The court agrees with the Plaintiffs, therefore, that a contempt standard is not the appropriate standard to apply. The Plaintiffs, however, also contend that the standard to apply is somewhat uncertain: either a breach of contract standard applies,[2] or a standard which determines whether a FAPE has been denied.

■ The Plaintiffs have cited appeals from administrative hearing officer determinations in which the reviewing body evaluated whether there was a breach of the settlement agreement by determining whether there was a denial of a FAPE. *See e.g., Jersey Shore Area Sch. Dist.*, 32 IDELR 194 (SEA Pa.1999). This approach is an appropriate one. In fact, even when arguing that the traditional contract standard applies, the Plaintiffs identify as the damage stemming from the breach of contract that E.D. was denied a FAPE, and Dukes was denied the right to informed participation in E.D.'s education.[3]

At the oral argument held on the cross-motions, the Plaintiffs advanced the argument that once a school board has agreed to do something, it cannot avoid liability for failing to do so because it contends

---

**2.** The Plaintiffs have also cited authority for the proposition that an IDEA settlement agreement is to be examined with heightened scrutiny. The authority cited by the Plaintiffs, *W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995), adopted a heightened standard, rather than contract principles, to determine whether to enforce the settlement agreement, since it waived civil rights. As that is not an issue

in this case, the court will not apply the heightened standard referenced by the Plaintiffs.

**3.** The Plaintiffs apparently derive this description of the damage suffered from breach of the Settlement Agreement from cases interpreting the prejudice which occurs when IDEA notice requirements are not satisfied.

there was no harm to the student, so that any violation of the Settlement Agreement can be the basis for liability without a showing that there was a denial of a FAPE. In a case relied upon by the Plaintiffs, the school failed to follow a provision of the educational plan put into place for the student. *Central Bucks School Dist. v. Sara K.,* 34 IDELR 235 (Pa.2000). The *Sara K.* decision concerned an educational plan, not a settlement. The court can conceive of an argument that a school may agree to things in a settlement agreement that it does not consider strictly necessary for the student, in the spirit of compromise. In this case, however, it appears that the school was using the provisions of the Settlement Agreement as part of the IEP.

■ While the court finds the Plaintiffs' position to have some appeal, it is not a standard which has been adopted by the Eleventh Circuit and, in fact, appears counter to a standard which has been adopted. The Eleventh Circuit has rejected a rule that a procedural violation under IDEA entitles a plaintiff to relief. *See Doe v. Alabama State Dept. of Educ.,* 915 F.2d 651 (11th Cir.1990). In the Eleventh Circuit, the procedural violation must be shown to have harmed the student to entitle the plaintiff to relief. *Id.* at 663. The court must conclude, therefore, that the Eleventh Circuit similarly would not adopt a per se rule with regard to settlement agreements. Accordingly, the court will first determine whether a specific Settlement Agreement provision has been complied with, and then, if there is a violation, determine whether the violation resulted in a loss of a FAPE.

b. Provisions Allegedly Violated/Denial of FAPE

■ The first provision of the Settlement Agreement which the Plaintiffs contend was breached is paragraph 3(2). This paragraph provides as follows:

> The Schools will provide a speech/language evaluation of E.D. by Jana Robinette; will provide a subsequent parental consultation with Mrs. Hazel Dukes regarding the same; and will provide any services arising from the same as appropriate.

The Plaintiffs contend that although the evaluation was conducted by Jana Robinette, the parental consultation was insufficient because Cannon conducted it, and Cannon could not explain the results of Jana Robinette's testing. For example, she was unable to determine the overall Test of Auditory Perceptual Skills ("TOLD") score. The end result of the consultation was that Cannon informed Dukes that E.D. did not need speech and language services. According to the Plaintiffs, however, the purpose of the testing was not to determine if E.D. was disabled in speech and language, but to identify the deficient areas.

In her testimony, Cannon stated that the purpose of the test was to see "if [E.D.] had a need for continued speech and language services." Tr. at page 303. She then agreed with the statement that the testing was not to determine whether E.D. qualified as speech and language disabled, but to see if she needed services. *Id.* On page 312 of Cannon's testimony, cited by the Plaintiffs, she stated that she told Dukes that E.D. did not have a need for speech and language services because there was no need for services from a speech language pathologist. Tr. at page 312:11–313:1. Cannon was also asked whether the speech and language testing showed areas of weakness, and Cannon responded that it did, but that she was not looking at teaching strategies when she was explaining the test results to Dukes. *Id.* at 312–13.

The Plaintiffs' argument that Dukes was deprived of a meaningful consultation about the test results cannot be accepted by this court without some evidence that the Settlement Agreement required that Dukes be provided information about teaching strategies, rather than merely that language services (such as a speech therapist) were not needed. In the absence of such evidence, the court accepts the Hearing Officer's determination that the plain language of this provision was not violated because the testing was provided, there was a consultation, and Dukes was informed that no speech and language services were required.

■ Another alleged violation of the Settlement Agreement was the requirement in provision 3(3) that Cannon consult with Dr. Nolan. The Settlement Agreement states that the schools will consult with Dr. Nolan for clarification of the recommendations in his January report, that the schools will incorporate his recommendations in the IEP, and the schools will provide a draft IEP with sufficient time prior to the IEP meeting for his review and comment.

The Plaintiffs argue that Dukes agreed to the settlement because E.D. would be given extra protection by having Dr. Nolan participate in formulating the IEP. If Dr. Nolan was not to be an active participant, the Plaintiffs argue, there was little meaning to the settlement agreement provision that he be consulted.

The Plaintiffs contend that Cannon did not consult with Dr. Nolan about his recommendations. They state that she only asked about the further testing he recommended and did not ask about his recommendation that the IEP be restructured. Dr. Nolan also recommended that newsreels, filmstrips, educational television and other similar forms of instruction be used. The Plaintiffs state that although Cannon understood this recommendation, the

school has not used these specific techniques and that the IEP drafted on May 3, 2002, and the final IEP of July 12, 2002, do not provide for the use of these audio visual techniques. According to the Plaintiffs, the reference to audio and visual techniques in the July 12, 2002 IEP is too general and does not mention these specific tools. The Plaintiffs admit that the July 12 IEP also stated that a computer would be used for written language, but state that the computers provided by the school were returned because they did not work.

Dr. Nolan testified that there were places in the July 12 IEP where audio and visual techniques came up. *See* Tr. at page 1322. Frazier testified that in tutoring E.D. she used multiplication tapes, money, games, flash cards, a clock, and a computer. Tr. at 119, 128. Dr. Nolan testified that in one of his reports, he mentioned the use of actual money, real clocks, and computer programs. Tr. at 1332.

The Plaintiffs dispute that using games, money, and clocks is sufficient to meet the terms of the Settlement Agreement because, if that were the case, the school should have told Dukes that those techniques were being used when she expressed concern, rather than telling her that Dr. Nolan's recommendations would be added when E.D. went back to school. The Plaintiffs also state that since Frazier was using these techniques before she saw Dr. Nolan's recommendations, these methods of teaching were not an incorporation of his recommendations. Finally, the Plaintiffs state that the computer provided by the schools did not work, so E.D.'s home computer was used, and, therefore, this was not a service provided by the schools.

Even according to Dr. Nolan, the July 2002 IEP contemplates the use of audio and visual techniques. Such techniques

were being used even before required by an IEP, or apparently, before recommended by Dr. Nolan. Dr. Nolan testified that although he listed examples of audio and visual techniques, there are a variety of formats for audio and visual materials which could be appropriate, depending on the subject matter. Tr. at 1333. He stressed that the importance was in teaching through a method other than reading, "[w]hether it's a clock that you can touch or a movie." Id. at 1334 at lines 15–16, 18–19.

The court cannot conclude that the fact that audio and visual techniques were already being used at the time of the July IEP means that there was a violation of the Settlement Agreement because Dr. Nolan recommended that they be used. The Plaintiffs essentially want this court to conclude, contrary to Dr. Nolan's testimony, that the Board violated the Settlement Agreement because it did not incorporate all of the examples of audio and visual techniques listed by Dr. Nolan in his report. The court cannot so conclude.

The court also must conclude that, although there was apparently some problem with the computers supplied by the schools, it appears that, according to Frazier's hearing testimony, the programs were supplied by the school system. Tr. at page 120. Therefore, the court concludes that services were provided by the schools with regard to the use of the computer as a teaching tool.

■ The Plaintiffs also argue that Cannon did not provide the results of the school's tests to Dr. Nolan although the Settlement Agreement required her to give him the information he requested. Cannon testified that she thought the schools only had to consult with Dr. Nolan, but did not have to follow what he said. Whether or not providing test results to Dr. Nolan would have been a good idea, the court cannot conclude that the language of the Settlement Agreement contains that requirement.

The Plaintiffs further contend that Dr. Nolan was not given a draft IEP in advance of the IEP meetings in May and June. Dr. Nolan has testified that he was sent the draft IEP in June. Dr. Nolan made comments on the draft IEP, stating that the benchmarks were set too high. Tr. at page 1325. The benchmarks in the final IEP were lowered. Id. at page 1325 lines 22–23 through page 1326 line 1.

There is apparently a great deal of dispute over whether the May meeting resulted in an IEP, or merely a draft IEP. The Plaintiffs argue that the Hearing Officer made contradictory findings on this point. The portion of the transcript pointed to as a finding by the Hearing Officer that the May meeting resulted in an IEP, however, is somewhat unclear as to whether it is a finding, or a paraphrasing of Cannon's testimony. See Hearing Officer Decision at page 128. The Hearing Officer specifically stated that the May meeting was to form a draft IEP. See id. at 146. The Plaintiffs refer to Cannon's testimony and state that she admitted that the May document was an IEP after listening to a tape recording of the meeting which indicates that no other meeting was scheduled until July. Cannon testified on re-direct, however, that the May IEP was a draft. Tr. at page 952.

The Plaintiffs contend that Dr. Nolan should have been provided a draft IEP prior to any IEP meeting. Therefore, for purposes of this argument, as long as the May and June meetings were IEP meetings, it does not matter whether those meeting resulted in IEP's or draft IEP's. Although there may have been a technical violation of the Settlement Agreement in failing to provide a draft IEP to Dr. Nolan before all IEP meetings, the Plaintiffs have not demonstrated that such a viola-

tion denied E.D. a FAPE, since Dr. Nolan was provided a draft and he provided input before the IEP meeting in July, pursuant to which the final IEP was adopted.

Considering all of the testimony pointed to by the parties on this point, the court agrees with the Hearing Officer that this provision of the Settlement Agreement was not violated.

■ Paragraph 3(4) of the Settlement Agreement states that the schools will provide diagnostic testing by a learning disabled teacher with assessment in reading, math, and written language to determine E.D.'s needs in theses areas. The Board points out that the following assessments have been conducted of E.D.: a five part speech/language evaluation on February 12, a KeyMath Revised on February 19, a Sucher–Allred Reading Placement Inventory on February 19, Woodcock–Johnson Psycho–Educational Battery Revised Tests of Achievement on April 16, Alabama Direct Assessment of Writing in February, the Stanford Achievement Test Series in April, and the Otis–Lennon School Ability Test in April.

The Plaintiffs state that the Alabama Direct Assessment of Writing, the Stanford Achievement Test Series, and the Otis–Lennon School Ability Test are standardized tests administered to all students. According to the Plaintiffs, E.D. was not evaluated for written language. Cannon testified that E.D. was not evaluated in written language because Dr. Nolan said that she did not need further evaluation in written language. The Plaintiffs also state the tests were given by Cannon, not a learning disabled teacher, and that the test scores do not indicate if the diagnostic portion of the evaluation was given.

The Hearing Officer found that this portion of the Settlement Agreement was substantially complied with because, although there was no written language assessment, Cannon legitimately misunderstood Dr.

Nolan's recommendation on this matter. The Plaintiffs argue, however, that whether or not the testing was recommended by Dr. Nolan, which they contend it was, the Settlement Agreement required that the testing be administered.

In their argument, the Plaintiffs state, as the Hearing Officer found, that Dr. Nolan disputed that no language assessment had to be given, and that his report and documentation indicate otherwise. The court is, therefore, left with a finding that Dr. Nolan disputes that he told Cannon not to test E.D. in an area in which the Board had agreed to provide testing. Even if Cannon thought Dr. Nolan did not feel the testing was necessary, Cannon failed to do what the Settlement Agreement required.

■ In deciding whether the violation of the Settlement Agreement denied E.D. a FAPE, the court must bear in mind that a denial of a FAPE is difficult to establish. The standard for whether an IEP provides a FAPE is whether it is reasonably calculated to confer the basic floor of educational benefits. *Devine v. Indian River County School Bd.*, 249 F.3d 1289, 1292 (11th Cir.2001). "While a trifle might not represent 'adequate' benefits ... maximum improvement is never required." *JSK By and Through JK v. Hendry County School Bd.*, 941 F.2d 1563, 1573 (11th Cir.1991).

The Eleventh Circuit noted that, although it was not expressly adopting a test for a FAPE which had been applied by the district court, the test which had been applied was at least as stringent as any the Eleventh Circuit had applied. *School Bd. of Collier Co. v. K.C.*, 285 F.3d 977 (11th Cir.2002). In that case, one of the factors considered was whether the program was individualized on the basis of a student's assessment and performance. *Id.* at 982.

The testing required by the Settlement Agreement in this case was apparently

intended to be used to determine the extent to which E.D. needed to have her written expression skills addressed, and would have been used to formulate strategies to improve those skills. This testing was agreed to by the parties to provide E.D. with a FAPE. The failure to do the testing means that neither the Plaintiffs, the Board, nor consequently this court, know whether this testing would have revealed any area of need for E.D. The court concludes, therefore, that violation this provision of the Settlement Agreement denied E.D. a FAPE.

■ Paragraph 3(9) of the Settlement Agreement provides that tutoring will be provided three days a week and that the timing of reintroduction of E.D. to her neighborhood school shall be determined by Carol Dean, in consultation with Dukes and E.D.

There is no question that E.D. has been provided tutoring, although the Plaintiffs have complained that tutoring was halted from March 18 to April 2[4] and from May 21 to July 1. The Board states that the tutor had problems with scheduling and that there was some confusion that led to the break in tutoring in the summer. According to the Board, the confusion stemmed from Frazier's understanding that a schedule was not to be decided at the beginning of the summer until Dukes had consulted with her attorney. Frazier's testimony at the hearing was that at the end of the school year, she told Dukes they needed to set up a tutoring schedule so that Frazier would know when she needed to make arrangements for her own children. Tr. at page 209. Dukes suggested that they speak with her attorney. *Id.* It was a couple of weeks before tutoring

began again, during which time letters were sent between the attorney and the school. *Id.* at 210–11.

The court must agree that although tutoring was suspended for fairly long periods during the summer, the evidence indicates that it was suspended only because there was a scheduling issue, not because services were suspended. E.D. was still provided tutoring in the summer once the scheduling issue was resolved. Therefore, the court agrees with the Hearing Officer that this portion of the Settlement Agreement was not breached.

The July IEP stated that E.D. would be back in her neighborhood school by August. The Plaintiffs contend that no plan was in place to transition E.D. back to school. The Plaintiffs state that the IEP drafted in July 2002 contemplates making use of the Sunsational program to transition E.D. back into the school, but that program ended in June. The Circle of Friends was not to occur until E.D. was back in the classroom.

Dean testified that E.D. was not ready to return to the school setting. Cannon testified that the proposed return to school was not necessarily all day, every day, and that the IEP team discussed shortened school days or less than five days a week in school.

The Hearing Officer concluded that this provision of the Settlement Agreement was not violated in that the timing of the reintroduction of E.D. to her school on a regular basis will be determined by Dean, in consultation with Dukes and E.D. as mandated by the Settlement Agreement. The Hearing Officer relied on Cannon's testimony that the IEP team contemplated

---

**4.** Although the Plaintiffs note this lapse in providing tutoring services, there is no evidence that services were stopped. It appears merely that those tutoring sessions were cancelled. In her testimony during the due pro-

cess hearing, Frazier testified that when she had to cancel a tutoring session, she offered to make the time up. Tr. at page 118: 23–119:1.

that the return to school in August would not necessarily be on a regular basis. The Plaintiffs urge the court not to accept Cannon's characterization of the IEP, stating that Cannon is untrustworthy.

The court is troubled by the restrictive reading of the term "regular basis" by the Hearing Officer. Technically, it does appear, however, that as long as Dean, in consultation with the Plaintiffs, has the final say on when E.D. will be attending the neighborhood school rather than being provided services at home, then the Settlement Agreement is not breached, even if E.D. is required to attend the neighborhood school to receive educational services. Therefore, although stating that she will be back in school, at least part-time, in August may not be a technical violation of the Settlement Agreement, the court will more fully discuss below whether this arrangement has been demonstrated to fail to provide E.D. with a FAPE as a matter of E.D.'s substantive rights under IDEA.

 The Settlement Agreement provides in paragraph 3(11) that the schools will consult with Beverly Hunter of the State Board of Education. There is evidence that Hunter was consulted. The Plaintiffs, however, state that Hunter never met with E.D. and that she was not consulted until after the second request for due process had been filed. At the hearing, it was explained that Hunter's involvement was delayed because phone messages left at the State Department of Education did not reach her. The Plaintiffs contend that had Cannon truly wanted to consult with Hunter, she would have attempted to contact her earlier, and would have tried other avenues of contact.

This court must agree with the Hearing Officer that, as to this, there is no violation of the Settlement Agreement. Although the timing of the consultation with Hunter was not optimal, the fault in relaying messages did not lie with the Board.

 The Settlement Agreement specified that particular standardized tests were to be administered to E.D. With respect to these standardized tests, the Board admits that the Woodcock–Johnson test was administered twice and that, under the language of the settlement agreement, the WIAT was to be administered the second semester.

The Hearing Officer concluded that this technical violation did not substantially violate the Settlement Agreement, based on Dr. Nolan's testimony that the reason for requiring two different tests was to avoid a rehearsal effect, but that there would not have been much rehearsal effect. T. at 1258–59. Dr. Nolan testified that the rehearsal effect should not have made a huge difference. *Id.* at 1259. Dr. Nolan also testified, however, that while the test results could indicate that there had been improvement, he did not find that level of improvement to be present when he administered his own testing.

This court must disagree with the Hearing Officer that the evidence indicates that there was no harm to E.D. as a result of the administration of the wrong test. The court finds that the usefulness of the assessment required by the Settlement Agreement was vitiated by the fact that it is difficult to discern whether the test results show improvement. Without a useful basis from which to evaluate her needs, the ability to construct an appropriate educational plan is impaired. Therefore, while the court certainly accepts the Hearing Officer's finding that Cannon's administration of the wrong test was not done with malicious intent, the court cannot conclude that this violation was de minimis. To the contrary, this court concludes that the violation denied E.D. a FAPE, as it did not provide an accurate basis for assessing whether her needs were being addressed or at least made the results of that assess-

ment questionable and, therefore, an unreliable basis from which to determine if her needs were being addressed.

The relief to be afforded the Plaintiffs for the violations of the Settlement Agreement found by this court will be discussed below.

### 2. Procedural and Substantive Violations of IDEA

There are two bases for asserting claims under the IDEA: violations of procedure and violations of the substantive guarantee of a FAPE. *Doe v. Alabama State Dept. of Educ.*, 915 F.2d 651 (11th Cir.1990). For ease of analysis, the court will address these claims according to the time period in which they arose.

#### a. January to May 2002

##### 1. Procedural

 In analyzing the procedural violations pointed to by the Plaintiffs, the court must keep in mind that even a finding that there is a procedural violation does not necessarily entitle a plaintiff to relief. As stated earlier, the Eleventh Circuit has previously rejected an argument that a procedural violation is per se a violation of the statute. *See id.* at 661. This rule has been extended to a procedurally defective IEP. *See School Bd. of Collier County, v. K.C.*, 285 F.3d 977, 982 (11th Cir.2002). "In evaluating whether a procedural defect has deprived a student of a FAPE, the court must consider the impact of the procedural defect, and not merely the defect per se." *Id.*

 The IEP which was in place at the time the Settlement Agreement was adopted on May 3, 2001 and was set to expire on May 23, 2002. During the period in which that IEP was in effect, E.D. suffered the traumatic school event which caused her to be taken out of the school during the first semester and schooled at home by a tutor during the second semester. The Plaintiffs contend that the IEP did not reflect this change in circumstances, and so the services provided may not be considered, as they were not provided through an IEP. The Plaintiffs contend that there was a violation of IDEA, as the previous IEP was inappropriate and should have been abandoned once the settlement agreement was reached. The Plaintiffs point out that there was testimony at the hearing that Frazier was not following the IEP in April 2002.

On April 7, 2002, Dukes was provided a copy of the May 3, 2001 IEP when she requested E.D.'s IEP.[5] The May 3, 2001 IEP had an addendum, signed by Cannon and dated January 7, 2002, which stated that E.D. was home schooled the first semester of 2001–2002, and the school system began providing tutoring services in January 2002. The addendum further states that a new IEP will be written by the IEP team. Plaintiffs' Exhibit 5. In her testimony, Cannon agreed that the IEP as written could not be implemented at home and that the school should have had an IEP meeting to make amendments and changes to the IEP. Tr. at pages 1002–1003. The Settlement Agreement further anticipated that there would be a new IEP. Cannon testified that there was a delay in time between the Settlement Agreement and the first IEP type of meeting in May of 2002 because they were waiting to give time for things to "gel" and to see what benefits would be gained from tutoring and counseling. Tr. at pages 387, 392. The Defendants take the position that at the time the second request for due pro-

---

**5.** While Dukes was provided the old IEP when she requested a copy of the IEP, the court cannot conclude that this action by the school either establishes that the Settlement Agreement was not an IEP, or that the old IEP was being followed, as Dukes was literally provided with a copy of the only document designated as an IEP.

cess was filed, the old May 3, 2001 IEP and the Settlement Agreement were in place.

First, the court concludes that whether or not Cannon's addendum without an IEP meeting was a violation of IDEA is not at issue, as that alleged violation occurred prior to the Settlement Agreement which was entered into to resolve IDEA violations.

The Hearing Officer concluded that the delay in putting into place a new IEP was not so substantial as to violate E.D.'s rights. Under the time line as established by the record, a meeting was held with Dukes on April 12; two additional meetings in April were cancelled by Dukes; an IEP team meeting was held in May; an IEP meeting was held in June, which Dukes refused to attend; another meeting was scheduled in June; and the IEP was adopted in July during a meeting which the Dukes did not attend.

The Hearing Officer concluded that following the Settlement Agreement while in the process of revising the IEP was reasonable. The Hearing Officer also noted that E.D.'s attorneys are experienced in this area of the law and would not have agreed to a Settlement Agreement that did not provide her a FAPE. He further stated that at the time of the settlement, he reviewed the Settlement Agreement and determined that it complied with IDEA, and even if he determined that review of the Settlement Agreement in the instant case were appropriate, he would find that it did not violate E.D.'s right to a FAPE.

The Plaintiffs argue that E.D. could not have benefitted from the IEP because it was not being followed. They argue that E.D. did not benefit from her plan, because she did not have a plan, and there can be no FAPE because there was no IEP. The Fourth Circuit has concluded that where there was a delay in formulating an IEP so that no IEP was in place at the beginning of the school year, the court still had to determine whether the disabled child received a FAPE *MM· v. School Dist. of Greenville,* 303 F.3d 523 (4th Cir.2002). In *MM,* the court rejected that a draft IEP was insufficient, and determined that even though the IEP was not completed and signed, the school had offered a FAPE, and so there was no IDEA violation. This court agrees with the Fourth Circuit's approach and, consequently, the mere fact that the Settlement Agreement was in place, rather than a new IEP, is not dispositive.[6]

Although the court does not conclude from the record that the Plaintiffs were openly antagonistic in a manner which rises to parental misconduct, *see Town of Burlington v. Department of Education,* 736 F.2d 773 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the court accepts the findings of the Hearing Officer that some of the delay in formulating the new IEP apparently can be attributed to the Plaintiffs. This is significant under the Eleventh Circuit's decision in *Doe v. Alabama State Department of Education,* 915 F.2d 651 (11th Cir.1990). In that case, a school provided educational services without the benefit of any written IEP. During the period in which services were provided, however, the school and the parents were in contact in an attempt to work out an acceptable IEP. The Eleventh Circuit concluded that the district court was not clearly erroneous when it concluded because the delay in formulating the IEP was caused by the parents, there was no violation of the procedural requirements of the statute. *Id.* at 663.

---

**6.** The issue of the FAPE provided for by the Settlement Agreement is discussed below in the discussion of the alleged substantive violations.

 Similarly, in this case, it is clear that the Settlement Agreement contemplated that there would be a new IEP. The parties agreed to the provision of certain services, but those were being provided pursuant to the Settlement Agreement, not a formal IEP. The IEP in existence was no longer relevant, but had not yet expired. In other words, there was an IEP in place, but services were being provided that were not in reference to that IEP, and no new final IEP was drafted until July 2002.

Under *Doe,* however, the mere fact that services were being provided without specific reference to an IEP is not dispositive. The delay in drafting the final IEP was at least in part caused by the Plaintiffs. This finding is not intended to have a pejorative connotation. As in *Doe,* active participation on behalf of the child can have a delaying effect. Because the delay was not entirely the Board's fault, however, the court must conclude that the continued failure to implement an IEP is not a violation of the procedural requirements of the statute.

## 2. Substantive

The Plaintiffs have argued that even if the court were to look outside of the May 2001 IEP, to the terms of the Settlement Agreement, E.D. was not receiving a FAPE under the Settlement Agreement. For instance, they state that although she was receiving counseling, the counseling was intended to help her return to school, and she is not ready to do so.

The Plaintiffs' argument is unusual in that they are arguing that the services to which they agreed in the Settlement Agreement were not sufficient to provide a FAPE.[7] As the Plaintiffs point out, a district court outside of this circuit has determined that a Settlement Agreement does not allow a school board to contract around or out of IDEA. *See D.R. by M.R. v. East Brunswick Bd. of Educ.,* 838 F.Supp. 184, 193 (D.N.J.1993), *aff'd,* 109 F.3d 896 (3d Cir.1997). That court also concluded, however, that if the school was acting within the law, the parents could not ignore the settlement agreement in an attempt to get a "better bargain." *Id.* The court further acknowledged that allowing parents to challenge educational services provided pursuant to a settlement agreement could mean that parents could simply disregard the terms of the settlement and would always be free to seek a hearing on the needs of the child. *Id.* The court expressly stated that it was concerned that a narrow reading of its "holding will tomorrow eliminate settlement agreements in special education cases." *Id.* The court explained, however, that in its view, there is a presumption that at the time the settlement agreement was entered into, the agreed-upon services met the child's educational needs. *Id.* It is only upon a showing by the parents that there has been a change in circumstances such that the child's educational needs are no longer being met, that the parent can challenge the settlement agreement. *Id.* at 193–94. The court found this interpretation of its ruling to be necessary to prevent "reducing settlement agreements in special education cases to a nullity . . . ." *Id.* at 194; *see also D.R. by M.R.,* 109 F.3d at 901 ("We are concerned that a decision that would allow parents to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements.").

---

**7.** This is to be distinguished from the argument that provisions of the Settlement Agreement were violated, denying her a FAPE.

Essentially, the district and appellate courts in *D.R. by M.R.* concluded as a matter of law what the Hearing Officer expressed in this case; namely, that the parties reached an agreement which met the educational needs of the child. This court agrees that to avoid rendering settlements in future cases a nullity, for parents to challenge the services provided, to which they agreed in the settlement agreement, there must be a showing of changed circumstances. While the Plaintiffs have argued that E.D. was not being provided a FAPE, with reference to Settlement Agreement provisions which were not breached, arguments about the progress E.D. has achieved indicate not that circumstances had changed, but that the educational services agreed to had not yet been successful. An IEP was later developed in an attempt to provide the needed services based on E.D.'s needs as they arose while she was being provided services under the Settlement Agreement. This is a reasonable approach to take. *W.L.G. v. Houston County Bd. of Educ.*, 975 F.Supp. 1317, 1329 (M.D.Ala.1997)("a settlement will most often be tentative only, for it must always be subject to change, no less than annually, to meet the changing needs of the disabled student."). This court must conclude, therefore, that the change in circumstances which is required before a settlement agreement can be challenged for failing to provide a FAPE has not been demonstrated in this case. Therefore, the court concludes that no substantive violation of IDEA during the operation of the Settlement Agreement has been established.

### b. May to July 2002

#### 1. Procedural

The Plaintiffs contend that E.D. was not being provided services pursuant to any IEP during the summer months. The Plaintiffs also dispute that the May 3, 2002 document was an IEP for the summer months. The Plaintiffs argue that although the Defendants and the Hearing Officer have characterized the May 3, 2002 document as a draft IEP, if it was indeed a draft, there was no IEP in place for the summer.

The Defendants have responded to this argument by stating that because the IDEA imposes a "stay put" maintenance of placement when a request for due process is filed, the old IEP from May 3, 2001 and the Settlement Agreement remained in place as a matter of law until there was a new IEP. The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child ...." 20 U.S.C. § 1415.

It appears to the court that, based on a review of the record and the Hearing Officer's decision, there was no new IEP in May, but that the old IEP and Settlement Agreement were still in effect under the "stay put" provision, until the new IEP was made, in Dukes's absence, in July. The court, therefore, does not find a procedural violation.

#### 2. Substantive

The Plaintiffs argue that E.D. was not receiving any educational benefit during the summer months as she was not receiving the tutoring services which were supposed to be provided. Although there was no new IEP for the summer and the "stay put" mechanism applied the old IEP and Settlement Agreement through the summer, it was understood that services were to be provided. Tutoring continued and counseling with Dean continued through the summer months. Tr. at page 718. As discussed earlier, it appears from the record that the gap in tutoring services

did not last the entire summer, and was caused by a delay in obtaining a new tutoring schedule. Therefore, the court cannot conclude that E.D. was denied a FAPE from May until July 2002.

#### c. July 2002 and forward

##### 1. Procedural

■ The Plaintiffs contend that the IEP adopted in July 2002 is not timely because it was not developed until July, whereas the Settlement Agreement contemplated an immediate IEP revision. The Hearing Officer found, and the court accepts, that part of the delay in devising a new IEP was Dukes' refusal to participate in the summer IEP meetings and withdrawal of consent for Dr. Nolan to communicate with the school during this process. Accordingly, the court cannot conclude, under *Doe*, that the delay in formulating the final IEP rose to the level of a procedural violation.

■ The Plaintiffs also state that the IEP was drafted in violation of the procedures set out in 20 U.S.C. § 1414. The Plaintiffs state that the special education teacher who attended the meeting had never been a teacher of this child, although the Plaintiffs admit that the federal statute, unlike the state regulation, does not require the child's special education provider to be present. The Plaintiffs also state that the IEP team requires that a person be present who can interpret evaluations, but that Cannon could not explain E.D.'s test scores. The statute requires that a person be present who can "interpret the instructional implications of evaluation results." 20 U.S.C. § 1414. Even if the court were to conclude that the Board's reliance on the Special Education Director to perform this function was a procedural violation in this case, the Plaintiffs have not pointed to any harm which stemmed from Cannon's inability to explain any aspect of a test which had been administered to E.D. to the persons who attended the meeting.

The Plaintiffs also point out that the Student Profile was not an accurate reflection of E.D. For instance, it states she is on no medication and that she enjoys being around people, neither of which was true in July of 2002. The court has not been pointed to any statute or regulation, however, that defines what information must be included in a student profile from which to conclude that there was a procedural violation. Finally, the Plaintiffs take issue with the IEP's treatment of the area of "avoidance/school refusal." There is no dispute that the IEP includes statements of present level of performance, a goal, and benchmarks under this area. The court finds that the Plaintiffs' objections in this area are more appropriately considered as a substantive argument, which will be addressed below.

Upon review of the July 2002 proposed IEP, and the circumstances surrounding its drafting, the court accepts the findings of the Hearing Officer and determines that there were no procedural violations which resulted in harm to E.D. in the July 2002 IEP.

##### 2. Substantive

■ The Plaintiffs have challenged the new IEP which was formulated in July 2002. As stated earlier, the standard for judging the IEP is whether it is reasonably calculated to confer the basic floor of educational benefits. *Devine v. Indian River County School Bd.*, 249 F.3d 1289, 1292 (11th Cir.2001). "While a trifle might not represent 'adequate' benefits ... maximum improvement is never required." *JSK By and Through JK v. Hendry County School Bd.*, 941 F.2d 1563, 1573 (11th Cir.1991).

■ The Hearing Officer concluded that the Board is currently providing a

program that is reasonably calculated to enable the child to receive educational benefits. A consensus plan was developed by the Plaintiffs and the Plaintiffs' experts. It is this document to which Plaintiffs compare the July 2002 IEP. The IEP drafted in July was identified at the due process hearing as bearing several similarities to the experts' plan, including the use of a "coach" and the use of audio and visual aids. One difference which has been identified is that an outside monitor was not provided in the July 2002 IEP. The Plaintiffs have argued that according to their witnesses, E.D. should have been monitored by an independent, third party, but that monitoring has not been provided. There was no testimony at the hearing, however, that an outside monitor was necessary to provide some educational benefit. Instead, the outside monitor was identified as part of a plan designed to be the best plan for E.D. The Board argues that while monitoring may have been part of the "best" plan for the child, the best plan is not what is required by law. The court agrees with the Hearing Officer's conclusion that the law does not require the "best" plan for the child. *See Walker County School Dist. v. Bennett ex rel. Bennett,* 203 F.3d 1293, 1296 n. 10 (11th Cir.)(stating that an IEP need not maximize the child's education), *cert. denied,* 531 U.S. 1059, 121 S.Ct. 670, 148 L.Ed.2d 572 (2000). The court further agrees that the IEP is reasonably calculated to confer the basic floor of educational benefits, once E.D. has returned to the neighborhood school on a full-time basis.

The court is, however, troubled by the Plaintiffs' argument that Dr. Handal testified that E.D. was not ready to return to the school environment and needed to be transitioned back to the school environment, Tr. at 586, but that the IEP made little provision for educational services outside of the school. Dean also testified at the hearing that she thought the IEP

would not work for E.D. at that time. Tr. at page 751. Although the Hearing Officer credited testimony by Cannon that the July 2002 IEP's contemplated return to school in August would not necessarily be full-time, there is no provision in the IEP for providing educational services at home on a part-time basis, should she be unable to return to school full-time.

The July 2002 IEP states the goal under the area of "Avoidance/School Refusal" is that E.D. will return to school by August 2002 and will attend daily classes with her sixth grade peers. Defendant's Exhibit 38. The IEP also notes that the "schools will continue present tutoring arrangements in reading, math, written expression for E.D. (3 days a week/3 hours each day) until E.D. returns to neighborhood school". The Board pointed to this provision as establishing that E.D. would be allowed to return to school for partial days. The IEP however, was formulated during the summer. The terms of this tutoring are the same as the terms of the tutoring which was already in place. The Plaintiffs did not read this provision as allowing for a partial return to school, and the court agrees that it could be read as only applying until school began in August.

In the reading area of the IEP, it states that instruction will be provided 20–30 minutes twice per day beginning in August 2002 for one year and that summer instruction will be offered through tutoring 2–3 times weekly. It further states that when "school begins in August, instruction will be provided in a resource room at the elementary school." Under the area of math the IEP provides that instruction will be provided in the resource room beginning August 5. In the area of written expression, the proposed IEP states that instruction will be provided in the resource room for 30–45 minutes each day beginning August 5.

The IEP makes no mention of how or the extent to which these subject areas will be addressed if E.D. is unable to return to school full-time. The IEP as drafted will only confer educational benefit if E.D. is actually in the neighborhood school to receive the educational services. Even assuming that the reference to tutoring is a sufficient description of how E.D. is to be educated should she fail to return to school at all; namely, she will be tutored at home as she was in the summer months, there is no description of how E.D. would be educated if she were able to return to school for a few hours each day, or a few days a week.

As was discussed above, the Hearing Officer determined that there was no violation of the provision in the Settlement Agreement that the timing of reintroduction of E.D. to her school would be determined by Dean, in consultation with Dukes and E.D., even though the IEP appeared to require that E.D. would begin school in August. The Hearing Officer apparently relied on Cannon's testimony that the proposed return to school was not necessarily all day, every day, and that the IEP team discussed shortened school days or less than five days a week in school. This court has accepted that finding as it relates to the alleged breach of the Settlement Agreement. In the context of the FAPE provided by the July IEP, however, the court must conclude that if it were in fact contemplated that Dean, in consultation with the Plaintiffs, would determine when E.D. would be reintroduced to the school, and that the August date was not necessarily for a return on a regular basis, then the IEP should have discussed providing E.D. educational services during any periods in which she may have been unable to attend school full-time. Accordingly, the court disagrees with the determination of the Hearing Officer and concludes that the Plaintiffs have established a substantive violation of the Plaintiffs's

rights under IDEA by the IEP's failure to provide for educational services should E.D. fail to return to school on a regular basis. An IEP which omits any discussion of how E.D. is to be educated if she cannot return to school on a full-time basis is not reasonably calculated to provide some educational benefit because there is no discussion of how she would be provided any educational and related services.

■ The court also finds that there is a denial of a FAPE in that the July 2002 IEP does not adequately provide for strategies for E.D. to return to school on a full-time basis. The Board has argued that it is not the role of this court to choose methodology. Evidence adduced at the hearing, however, established that E.D. was unable to return to the school in any capacity in July 2002. Strategies aimed at introducing her to the school which were to occur at school, such as the Circle of Friends, are not strategies designed to get her to initially enter the school. Furthermore, since presumably the provisions of the IEP were considered by the IEP team to be necessary to provide educational benefit to E.D., the fact that the Sunsational Program had already concluded at the time that the IEP was drafted necessarily means that a provision calculated to provide her with a FAPE could not be met. The failure to provide an educational benefit arises because not all of the strategies the IEP included as being necessary could be carried out. Accordingly, the court finds that with respect to the school avoidance provisions of the IEP, there is a denial of a FAPE.

### B. *Available Relief*

The Plaintiffs have asked for declaratory and monetary relief, as well as compensatory education and other appropriate relief for the Board's violation of E.D.'s rights under IDEA. The court will separately

address monetary and other forms of relief.

### 1. Monetary Relief

#### a. IDEA

The Plaintiffs have argued that they are entitled to damages under IDEA. They concede that courts are split on this subject. They argue that some courts which have concluded that there is no § 1983 action for violation of IDEA have left open the possibility that damages could be awarded under IDEA. The Plaintiffs also rely on the Supreme Court's decision in *Franklin v. Gwinnett Co. Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). In that case, in which a claim was brought under Title IX, the Court explained that unless there is clear direction to the contrary by Congress, federal courts have the power to award any appropriate relief. *Id.* at 70–71, 112 S.Ct. 1028.

■ The beginning point for this court's analysis, however, is *Powell v. Defore*, 699 F.2d 1078 (11th Cir.1983). In *Powell*, the Eleventh Circuit addressed the remedies available under the predecessor statute to IDEA, and concluded that as a "general rule, compensatory damages are not available ...." *Id.* at 1078.[8] While it may be that *Franklin* provided an analytical framework by which the Eleventh Circuit sitting *en banc* can change the rule applied in *Powell*, it is not the role of this court to overrule the prior opinion in *Powell*. *See United States v. Chubbuck*, 252 F.3d 1300, 1305 n. 7 (11th Cir.2001)("the prior precedent rule would not apply if intervening on-point case law from either [the Eleventh Circuit] en banc, the United States Supreme Court ... existed."). A panel of the Eleventh Circuit, and there-

fore this court, is not "at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled by the Supreme Court." *Id.* In addition, if it were clear that the amendment to the statute changed the rule with regard to compensatory damages, it would seem that there would be a consensus in the courts as to the availability of monetary relief.

■ The court need not resolve this issue in this case, however. This case is before the court on cross motions for judgment on the record. At oral argument, the Plaintiffs were asked what a proper measure of damages would be in this case. Although the Plaintiffs' attorney offered an amount to the court, the Plaintiffs' attorney stated that there is no evidence in the record upon which to base the number offered. While items of damages need not be proven to a legal certainty, they must not be based on speculation. Because there is absolutely no evidence before the court as to any element of damage, or any evidence to support the value of the one element of damage which was identified at oral argument, the court concludes that even if monetary damages are properly awarded under the IDEA, they are not properly awarded in this case.

■ E.D. may, however, be entitled to other forms of relief. For instance, compensatory education is appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by the statute. *Todd D. by Robert D. v. Andrews*, 933 F.2d 1576, 1584 (11th Cir.1991). Other forms of relief are discussed below.

8. Although a case relied upon by the court in *Powell* was overruled, the Eleventh Circuit later stated that the rule that compensatory damages were not available was still good law. *Manecke v. School Bd. of Pinellas Coun-*ty, Fla., 762 F.2d 912, 915 (11th Cir. 1985)("We thus discern no sound reason for questioning the result reached in *Powell*, a case in which the plaintiffs sought tort-type damages, not tuition reimbursement.").

#### b. § 1983

■ The issue of relief under § 1983 is really not an issue of whether damages can be awarded for a violation of § 1983, as they clearly can when damages are proven. The issue is the ability of a plaintiff to use § 1983 as a mechanism by which to bring an IDEA claim. This issue has caused a split among the circuits. *See e.g., Padilla v. School Dist. No. 1 in the City and Co. of Denver,* 233 F.3d 1268 (10th Cir.2000)(no § 1983 claim available); *Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987)(§ 1983 claim available); *see also Katherine S. v. Umbach,* No. No. CIV.A. 00–T–982–E, 2002 WL 226697 (M.D.Ala. Feb.1, 2002)(no § 1983 claim available). The split arises from the various courts' interpretation of a statutory amendment in light of a decision by the United States Supreme Court.

In 1984, the Court held that, based on the remedial scheme of the predecessor to IDEA, the EHA, Congress intended to foreclose private enforcement of education rights through laws such as Section 504 of the Rehabilitation Act. *See Smith v. Robinson,* 468 U.S. 992, 1012–13, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). In *Smith,* the Supreme Court was not presented with a § 1983 claim for violation of the EHA, and merely noted in a footnote that courts were in agreement that the EHA could not be used as a basis for a § 1983 claim. *See Smith,* 468 U.S. at 1009 n. 11, 104 S.Ct. 3457.

In response to this decision, Congress amended the EHA to add a provision which states that the statute "does not restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities ...." 20 U.S.C. § 1415(*l*). The legislative history of the amendment to the EHA is clear that Congress wanted to supercede the holding of *Smith.* *See* S. Rep. 99–112, 1986 U.S.C.C.A.N. 1798.

Some courts have concluded that Congress intended to allow for 42 U.S.C. § 1983 claims for violations of IDEA. Other courts, however, have reasoned that the amendment to the statute only changed the rule announced in *Smith* that claims based on violations of other statutes were foreclosed, but did not change that 42 U.S.C. § 1983 could not be used as a mechanism for bringing an IDEA claim. *See Padilla,* 233 F.3d at 1273. That is, while § 1983 might properly be used to vindicate a disabled child's constitutional rights or § 504 rights, it is not properly used to vindicate the child's rights under IDEA. The court takes from the conflict in the case law that the statute does not explicitly answer the question of whether an IDEA claim can be brought under § 1983.

There is precedent which indicates that the Eleventh Circuit would agree with the Tenth Circuit's interpretation. *See Holbrook v. City of Alpharetta,* 112 F.3d 1522 (11th Cir.1997). In *Holbrook,* the Eleventh Circuit held that a § 1983 action cannot be maintained in addition to a Rehabilitation Act or ADA claim if the only alleged deprivation is of rights created by the Act and the ADA. Since the substantive statutes provide extensive, comprehensive remedial frameworks, allowing the plaintiff to proceed under both would be to give the plaintiff two bites at the apple. *Id.* at 1530. Indeed this view has been adopted by another judge of this district, *see Katherine S.,* 2002 WL 226697 at *19, and this court does not disagree with the application of the *Holbrook* analysis to a § 1983 claim for violation of IDEA.

There is, however, binding precedent which speaks more directly to this issue. The Eleventh Circuit has stated that if an

IDEA claim is brought under § 1983, the plaintiff must exhaust all IDEA administrative remedies. *See N.B. v. Alachua,* 84 F.3d 1376 (11th Cir.1996), *cert. denied,* 519 U.S. 1092, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997). The holding of the case is that "because the plaintiff failed to exhaust administrative remedies, the plaintiff may not proceed with her § 1983 claims for violations of the IDEA." *Id.* at 1379. While the apparent recognition of the § 1983 claim for violation of IDEA is implicit and not the explicit holding of that case, if such a claim did not exist, the case would simply have been dismissed, and there would have been no need for the Eleventh Circuit to reach the exhaustion issue. This court cannot distinguish the case merely on the grounds that the court did not have to reach the issue, as in its reasoning, the court set out the grounds for dismissal in that case, including that compensatory damages are not available under the IDEA or under 42 U.S.C. § 1983 for violations of the IDEA. The court stated that because it found dismissal to be proper for failure to exhaust administrative remedies, it need not reach these issues. *Id.* at 1378. It was apparently clear in the case, therefore, that the plaintiffs were seeking to bring both an IDEA claim, and a § 1983 claim for violation of IDEA.

At oral argument, the Board advanced the argument that *N.B.* should be limited to its facts; namely, a case involving a procedural violation. The court is not aware of the basis for such an argument, as the *N.B.* court describes the basis of the plaintiff's claim as being a challenge to

being bused to a school for non-hearing students. This court need not address the procedural/substantive distinction, however, because, as stated earlier, at the oral argument on the cross motions filed in this case, the Plaintiffs argued that they are entitled to monetary damages, but admitted that there is no evidence in the record to substantiate the one item of damage identified by the Plaintiffs; namely, the cost of educating a student for a year. Without any proof of damages, the court must conclude that the Plaintiffs are not entitled to monetary damages in this case.[9]

### 2. Other appropriate relief

In the Complaint filed in this case, the Plaintiffs ask for the following relief for violations of E.D.'s rights under IDEA:[10] a declaratory judgment that the Defendant violated the IDEA and the Plaintiff's rights under 42 U.S.C. § 1983; an order that the Defendant immediately assemble an appropriate IEP team and schedule a meeting to develop an appropriate IEP for E.D. which includes an appropriate plan as recommended by E.D.'s psychiatrist, independent tutor, and counselor for re-introducing E.D. to the neighborhood school environment, as well as an appropriate plan for meeting E.D.'s academic, emotional, and socialization needs; order Defendant to provide appropriate compensatory education and related services to E.D. designed to meet her individual needs and to compensate her for having been denied a FAPE; enter a declaratory judgment stating that Plaintiffs are the prevailing parties and granting reasonable attorneys' fees and costs; and award other relief

---

9. Although the Plaintiffs made a passing reference to nominal damages at the oral argument in this case, they have not requested that form of relief in their Complaint, brief, or at oral argument.

10. The Plaintiffs also ask for relief based on actions of the Board in general. For in-

stance, they ask that the court order the Defendant to discontinue its discriminatory treatment of individuals with disabilities. The court concludes that these requests for relief are not appropriate as they are based on theories or broadbased violations not before the court.

deemed appropriate, including but not limited to money damages.

The court has considered these requests for relief and finds that some of them are appropriate forms of relief and that others, while they may be appropriate forms in some cases, have not been adequately substantiated in this case to be appropriate forms of relief.

■ With regard to the breaches of the Settlement Agreement which denied E.D. a FAPE, as those breaches are failures to assess E.D. within the letter of the agreement, the appropriate relief would appear to be to order the correct assessments to be made of E.D. With respect to the administration of the WIAT, however, the Settlement Agreement contemplated an administration of the WIAT and the Woodcock–Johnson at different points in the year, so merely ordering compliance with the Settlement Agreement will not remedy the failure to assess E.D. appropriately. It appears to the court that the appropriate remedy would be to allow the assessment schedule established in the Settlement Agreement to continue as the IEP team determines it is needed, but to require consideration by the IEP team of the testing Dr. Nolan conducted in June 2002, so that the results of the spring Woodcock–Johnson can be viewed appropriately by the IEP team. To the extent that the Plaintiffs may have born costs for Dr. Nolan's June testing, the court also finds that those costs must be reimbursed by the Board.

There is evidence before the court that once the second request for due process was filed by Dukes, she withdrew consent for Dr. Nolan to provide information to the school. It appears, but it is unclear to the court, that this extended to his test results. As the court is sure that Dukes only wants what is best for E.D., and as the evidence indicates that the results of Dr. Nolan's tests are necessary to properly gauge E.D.'s progress as reflected in the second administration of the Woodcock–Johnson, the court is certain that Dukes will agree to the release of these test scores. Should she fail to do so, the Board, and the IEP team, will be excused from considering Dr. Nolan's June 2002 test results, and from reimbursing the Plaintiffs for such costs.

Although the Plaintiffs made reference during oral argument to compensatory education and compensation for private tutoring and counseling, the court simply has not been provided enough information to determine whether such remedies are appropriate in this case. The court, therefore, declines to order such relief. The court does note, however, that the Settlement Agreement contemplates that counseling services provided by Ms. Carol Dean may include family counseling, to the extent that family counseling assists E.D. to benefit from special education and is necessary to provide her with a FAPE. Settlement Agreement at ¶ 8. As there is no time limitation on this provision, the court concludes that it is still in effect, so the Board is bound to comply with this provision of the Settlement Agreement. While the July 2002 IEP does not specifically refer to family counseling, it does say that E.D. will be provided counseling as prescribed by Dean. The court construes this provision to include the family counseling referred to in the Settlement Agreement.

■ The Plaintiffs requested that the court either appoint, or ask the parties to agree to an independent clinical psychologist to develop an IEP and to include E.D.'s psychiatrist in on the planning. The Plaintiffs point out that another judge of this district has ordered the imposition of an IEP developed by an outside expert. *See Chris D. v. Montgomery Co. Bd. of Educ.*, 753 F.Supp. 922 (M.D.Ala.1990). The court finds that it does not have evi-

dence before it to indicate that the extraordinary step of appointing an outside expert to formulate an IEP is appropriate. Because it is apparently undisputed, however, that E.D. needs to return to her neighborhood school, but E.D. will not do so, the court agrees that E.D.'s psychiatrist, Dr. Handal, should be involved in the IEP process so that strategies for how to return E.D. to the neighborhood school on a full-time basis can be discussed and formulated by the IEP team.

 With respect to the July 2002 IEP, the FAPE denial the court has found stems from the evidence that the strategies for reintroducing E.D. to her school are insufficient, even under the IEP as written, and there is no discussion of the extent to which E.D. will be educated in various areas at school and at home should she only be able to return to school part-time. Therefore, the Board, through the IEP team, must consider and formulate appropriate IEP goals, benchmarks, and services to apply during any transition period during which E.D. is receiving services at home and at school, and strategies to re-introduce her to the school environment.

The court concludes that the above listed relief is the appropriate relief to be afforded in this case. The court expresses no opinion as to the propriety of awarding attorneys' fees at this time, but will allow the Plaintiffs time in which to move for an award of attorneys' fees and costs.

## V. CONCLUSION

It is undisputed that E.D.'s current educational circumstances are not in her best interests. While the fault for her current circumstances lies neither wholly with the Plaintiffs nor with the Board, the parties in this case have not done all they can do to work together to aid E.D. It is this court's hope and expectation that the parties will do what is required of them to

remedy this situation. The court has determined that there have been some specific violations of IDEA and has attempted to provide an appropriate remedy for those violations. It is now up to the parties to use the remedies afforded by this court to devise an individualized plan for E.D. that will provide her the educational benefit required under the law.

Accordingly, it is hereby ORDERED as follows:

1. The Defendants' Motion for Judgment on the Administrative Record/Motion for Summary Judgment is DENIED as to the Plaintiffs' claims for violation of Settlement Agreement paragraphs 4 and 12 and the Plaintiffs' substantive IDEA claim based on denial of a FAPE by the July 2002 IEP, and is GRANTED in all other respects.

2. The Plaintiffs's Motion for Judgment on the Administrative Record is GRANTED as to the Plaintiffs' claims based on a violation of Settlement Agreement paragraphs 4 and 12 and the Plaintiffs' substantive IDEA claim based on denial of a FAPE by the July 2002 IEP, and is DENIED in all other respects.

3. If the results of Dr. Nolan's June 2002 tests of E.D. are provided to E.D.'s IEP team, the IEP team will consider the results of that testing. It is further ORDERED that the Plaintiffs will be reimbursed by the Defendant for the costs of such testing, if such costs were incurred by the Plaintiffs.

4. E.D.'s IEP team will consist of the parties required by IDEA and Dr. Handal. The IEP team is to consider and develop strategies to reintroduce E.D. to her neighborhood school, and to include appropriate IEP provisions for any transition period during which E.D. is to be educated at home and at school part-time.

5. The parties are DIRECTED to use their best efforts in good faith to resolve Plaintiffs' claims for attorneys' fees and costs by agreement. If no agreement can be reached, the Plaintiffs are given until August 29, 2003 to move for an award of attorneys' fees and costs.

A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.

### FINAL JUDGMENT

In accordance with the Memorandum Opinion and Order entered on this date:

1. It is hereby DECLARED that the Enterprise City Board of Education is in violation of E.D.'s rights under IDEA.

2. Judgment is entered in favor of the Plaintiffs, E.D. through Hazel Dukes and Hazel Dukes, and against the Enterprise City Board of Education, on the Plaintiffs' claims for breach of Settlement Agreement paragraphs 4 and 12, and for substantive violations of IDEA in the July 2002 IEP, subject to the determination of the issue of attorneys' fees and costs at a later date. Judgment is entered in favor of the Enterprise City Board of Education and against the Plaintiffs on all other claims.

3. The Board is enjoined to comply with Settlement Agreement paragraphs 4 and 12.

4. The Board is enjoined to convene an IEP team which includes Dr. Handal before the end of August 2003; if Dr. Nolan's June 2002 test results are provided, to consider those test results in formulating a new IEP and to reimburse the Plaintiffs for any costs incurred for those tests; to formulate strategies in the IEP to reintroduce E.D. to the neighborhood school; and to provide in the IEP for education in the home and school settings during any transition to educational services being provided in the neighborhood school full-time.